SIXTH DIVISION
February 19, 2010

No. 1-08-3603

| | | |
|---|---|---|
| TONYA WILBOURN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 L 2988 |
| | ) | |
| MARK CAVALENES, M.D., and RUSH OAK PARK | ) | Honorable |
| HOSPITAL, | ) | Clare Elizabeth |
| | ) | McWilliams, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Tonya Wilbourn, 40 years old at the time of her jury trial, filed this action to recover damages allegedly caused by the medical negligence of defendants Dr. Mark Cavalenes, a board-certified orthopedic surgeon, and Rush Oak Park Hospital, in her care and treatment for a transverse fracture to her right femur suffered as a result of a motor vehicle collision. Dr. Cavalenes transfixed plaintiff's fractured femur using a 12-hole dynamic compression plate manufactured by Synthes, Inc., a medical devices manufacturer, which failed within a month of implantation necessitating a second surgery where the failed compression plate was removed and never recovered. A compression plate is a metallic surgical plate which can be affixed to the surface of a long bone to set a bone fracture. A dynamic compression plate is designed to exert dynamic pressure between the bone fragments to be transfixed, and is secured to the bone to be transfixed by screws. Attorneys' Dictionary of Medicine and Word Finder, C-117 (2007).

The main issue at trial was whether Dr. Cavalenes used a narrow Synthes 12-hole dynamic compression plate rather than a broad Synthes 12-hole dynamic compression plate to transfix

plaintiff's fractured femur. Dr. Cavalenes testified that he used a broad plate, but after it broke and was removed, he sent the plate to pathology and it was never recovered.

Both narrow and broad Synthes dynamic compression plates are roughly 4.5 millimeters thick. The narrow Synthes compression plate, part no. 224-12, is approximately three-fourths inches wide and contains 12 holes where screws are placed to affix the plate to the femur, which are arranged in a straight line along the length of the plate. The broad Synthes compression plate, part no. 226-12, is approximately one inch wide and contains 12 holes where screws are placed to affix the plate to the femur, which are arranged in alternating fashion from side to side along the length of the plate. All parties' expert witnesses testified that Dr. Cavalenes would have deviated from the standard of care by using a narrow compression plate based on plaintiff's body weight. All parties agree that plaintiff was obese at the time of her first surgery, however; the record does not state plaintiff's body weight or height at that time. Plaintiff's sole theory against Rush was based on the doctrine of apparent agency. The jury rendered a verdict in favor of defendants and against plaintiff, and the trial court entered judgment on that verdict. Plaintiff filed a posttrial motion for a new trial, which was denied.

Plaintiff appeals, arguing that the trial court: (1) erred by striking one basis for her controlled expert's opinion that Dr. Cavalenes used a narrow dynamic compression plate to transfix her femoral fracture because a broad dynamic compression plate would not have failed within a month of implantation and instructing the jury to disregard her expert's statement, "I have never seen or heard of a broad plate failing or breaking in the first month after implantation," as violative of the disclosure requirements of Illinois Supreme Court Rule 213(f)(3) (177 Ill. 2d R.

213(f)(3)); and (2) abused its discretion by denying plaintiff's posttrial motion for a new trial based on Dr. Cavalenes' counsel's prejudicial comments during his cross-examination of plaintiff's controlled expert and in his closing argument. We affirm.

BACKGROUND

Plaintiff severely injured her right leg when she was involved in a motor vehicle collision on February 13, 2002. Emergency ambulatory services arrived shortly after the motor vehicle collision and transported plaintiff to the emergency room of Rush Oak Park Hospital in Oak Park, Illinois, where she was diagnosed with a mid-shaft transverse fracture to her right femur. The emergency room physician who treated plaintiff upon her arrival to the emergency room referred plaintiff to Dr. Cavalenes, the "on-call" staff orthopedic surgeon at Rush.

Dr. Cavalenes operated on plaintiff during the evening of February 15, 2002. Plaintiff's surgery began at 7:40 p.m. and ended at 11:10 p.m. Dr. Cavalenes attempted to transfix plaintiff's right femur by using an antegrade intramedullary rod[1] for one and one-half hours, but

---

[1] An intramedullary rod is a metal rod which can be inserted into the bone marrow canal of a long bone to reconnect the bone at the fracture site. The rod is secured in place with screws placed both above and below the fracture site. In the case of a fractured femur, an antegrade intramedullary rod can be inserted through the proximal end of the femur through an incision near the hip, as opposed to a retrograde intramedullary rod which can be inserted through the distal end of the femur through an incision near the knee.

was unsuccessful. A retrograde intramedullary rod was not immediately available and Dr. Cavalenes decided to affix a dynamic compression plate, to transfix plaintiff's fractured femur. Dr. Cavalenes testified at trial that he was unable to secure a retrograde intramedullary rod immediately prior to plaintiff's surgery. He testified that he contacted Rush's "equipment representative," by telephone, when he was unable to find a retrograde intramedullary rod in the hospital inventory, and that the "equipment representative" advised him that a retrograde intramedullary rod could be delivered in approximately one to one and one-half hours. Dr. Cavalenes then chose to use the compression plate instead. No "equipment representative" testified at trial. A 12-hole dynamic compression plate was available at Rush, which Dr. Cavalenes laterally affixed to plaintiff's femur. Plaintiff remained at Rush overnight for 15 days.

Plaintiff was discharged from Rush on March 1, 2002, after undergoing physical therapy for approximately two weeks after surgery. Upon discharge from Rush, plaintiff was instructed to ambulate with the assistance of a walker maintaining only "toe-touch" weight bearing on her right leg. At trial, plaintiff testified that her physical therapist explained to her that "toe-touch" weight bearing meant that weight necessary only to maintain her balance with the use of a walker. The discharge instructions included in the record as evidence shows that plaintiff was to maintain "toe-touch" weight bearing on her right leg until further instructions from Dr. Cavalenes. Plaintiff was scheduled for a "follow-up" examination with Dr. Cavalenes two weeks after her March 1, 2002, discharge from Rush.

On March 15, 2002, plaintiff left her apartment intending to go to a bank. To leave her apartment plaintiff was required to descend several steps. Plaintiff testified that her right leg "felt

weird" when she applied weight to it and her leg suddenly "just collapsed," and she fell. Plaintiff was transported by emergency ambulatory services to West Suburban Medical Center in Oak Park where she underwent a second surgery performed by Dr. Cavalenes. Three anterior-posterior view x-rays taken at West Suburban showed that the dynamic compression plate affixed to plaintiff's right femur had broken. No lateral view x-rays were taken.

During the second surgery, Dr. Cavalenes explanted the dynamic compression plate which he had affixed to plaintiff's femur during the first surgery and transfixed plaintiff's femur by using a retrograde intramedullary rod to give it more support. Dr. Cavalenes testified that he had the broken dynamic compression plate "sent to pathology," but that he could not recall whether he received a report from pathology. The broken dynamic compression plate was never recovered.

### 1. Plaintiff's Complaint and Discovery Disclosures

On March 15, 2004, plaintiff filed a complaint in the circuit court of Cook County against Dr. Cavalenes, West Suburban, and Rush.[2] In her complaint plaintiff alleged that Dr. Cavalenes negligently performed surgery on February 15, 2002, and that Rush was liable for Dr. Cavalenes' negligence based upon the doctrine of apparent agency.

On July 10, 2007, plaintiff filed answers to Illinois Supreme Court Rule 213 interrogatories identifying Dr. Philip Kregor, a board-certified orthopedic surgeon from Vanderbilt Medical School, as plaintiff's sole Rule 213(f)(3) controlled expert witness. Plaintiff's

---

[2] West Suburban was voluntarily dismissed on September 21, 2007, and is not a party to his appeal.

disclosure stated that Dr. Kregor would opine, among other things, that based upon his review of the "available medical images," that Dr. Cavalenes must have affixed a narrow dynamic compression plate to plaintiff's femur, not the broad plate that Dr. Cavalenes testified to; that the use of a narrow compression plate would have been a deviation from the standard of care as a result of plaintiff's body weight; and that the narrow dynamic compression plate failed on March 15, 2002, because there was no evidence of a fall that caused the compression plate to break because plaintiff claimed her leg "just collapsed." No additional basis for Dr. Kregor's opinion is contained in plaintiff's Rule 213 disclosure.

In his discovery deposition, Dr. Kregor also opined that Dr. Cavalenes deviated from the standard of care in performing plaintiff's first surgery by using a narrow dynamic compression plate. Dr. Kregor based his opinion that a narrow dynamic compression plate was used in the February 15, 2002, surgery on his review of the anterior-posterior view x-rays of plaintiff's right femur taken after the affixed dynamic compression plate failed. Dr. Kregor testified that the x-rays showed that the screws used to secure the plate to the femur formed a straight line which was characteristic of a narrow dynamic compression plate. Dr. Kregor testified that, like a narrow plate, a broad plate contains 12 holes from top to bottom, however, the holes in a broad plate alternate from side to side and were not formed in a straight line. Dr. Kregor also testified that the width of the plate on the x-rays he reviewed appeared to be narrow from his visual observation. At trial, Dr. Kregor testified that a narrow dynamic compression plate is three-fourths inches wide, whereas a broad dynamic compression plate is roughly one inch wide. Both narrow and broad dynamic compression plates are 4.5 millimeters thick. During Dr. Kregor's

discovery deposition, the following colloquy took place between Dr. Kregor and counsel for Dr. Cavalenes:

"Q:   Okay.  Now, for lack of a better term, you would agree with me that femoral plates that are the appropriate size for a patient can fail?

A:   Yes.

Q:   And broad plates utilized to repair mid-shaft femoral fractures can fail within a month of the original surgical procedure without any negligence on the part of the operating surgeon?

A:   I'd like to break that down into parts.  By that I mean I would say that….

Q:   Then let me withdraw and see if I can break it down for you. How's that?

A:   Okay."

The following exchange subsequently took place between Dr. Kregor and counsel for Dr. Cavalenes:

"Q:   Placing excess weight on a plated femoral fracture within the first month of repair can lead to damage to the plate?

A:   Theoretically, yes.  I will tell you that in practice that's extremely unusual."

Dr. Kregor testified at his deposition that every basis for his opinion was disclosed at his deposition.  Dr. Kregor was not questioned by counsel for plaintiff at his deposition.

Prior to trial, each defendant filed a motion *in limine* to bar Dr. Kregor from testifying as to any opinion or basis not disclosed in plaintiff's Rule 213 disclosures or elicited during Dr. Kregor's discovery deposition. The trial court granted both motions *in limine*.

### 2. Trial Testimony

Dr. Cavalenes testified at trial that he was a board-certified orthopedic surgeon, and has practiced as an orthopedic surgeon for 25 years. Dr. Cavalenes was a staff orthopedic surgeon at Rush at the time of plaintiff's first surgery. In the seven to ten years preceding plaintiff's first surgery, Dr. Cavalenes had performed a femoral plating only twice. Before operating on plaintiff, Dr. Cavalenes planned to transfix plaintiff's femoral fracture utilizing an intramedullary rod. Prior to beginning the surgery, he secured an antegrade intramedullary rod, but not a retrograde intramedullary rod. He testified that although he had more than a dozen preference cards on file at Rush, he did not have a preference card for an open reduction internal fixation of a femoral fracture. A preference card, Dr. Cavalenes explained, notifies a hospital of a surgeon's preferred materials for different types of surgeries so that the materials are available in the hospital's inventory.

As noted, Dr. Cavalenes operated on plaintiff in the evening of February 15, 2002. Plaintiff's surgery began at 7:40 p.m. and ended at 11:10 p.m. Dr. Cavalenes testified that he attempted to transfix plaintiff's femoral fracture by using an antegrade intramedullary rod for one and one-half hours, but was unsuccessful. He testified that after an unsuccessful attempt at placing an antegrade intramedullary rod, his preference as an orthopedic surgeon would be to then use a retrograde intramedullary rod but one was not immediately available. Dr. Cavalenes

8

testified that he contacted Rush's "equipment representative" by telephone who informed him that a retrograde intramedullary rod could be delivered in approximately one to one and one-half hours, but he was already in the surgical process.

Dr. Cavalenes then decided to use a dynamic compression plate to transfix plaintiff's fractured femur as an alternative. Dr. Cavalenes testified that he laterally affixed a broad dynamic compression plate to plaintiff's right femur. He testified that he was familiar with the appearance of a dynamic compression plate and was able to distinguish between a broad and narrow dynamic compression plate. He testified that the Synthes narrow dynamic compression plate bears part no. 224-12, which is engraved on the plate itself, and has holes for the insertion of screws which are in a straight line from top to bottom. A broad dynamic compression plate bears part no. 226-12, which is engraved on the plate itself, and has holes for the insertion of screws alternating side to side from top to bottom.

Dr. Cavalenes testified that he selected the broad dynamic compression plate during plaintiff's surgery and used that plate. Dr. Cavalenes testified that the anterior-posterior view x-rays from March 15, 2002, the day the dynamic compression plate failed, showed that a broad plate was used because he observed that the heads of the screws used to secure the plate to plaintiff's femur were on alternating sides of the plate.

Dr. Cavalenes testified that plaintiff presented herself to West Suburban on March 15, 2002, reporting that she had fallen and that her right leg "collapsed" as a result. Dr. Cavalenes opined that a fall while placing weight on a leg with a dynamic compression plate can result in failure of the plate, even when a broad plate is used. Dr. Cavalenes testified that he operated on

plaintiff on March 15, 2002, for a second time, and removed the broken plate and transfixed plaintiff's femoral fracture using a retrograde intramedullary rod.

Dr. Cavalenes testified that he did not deviate from the standard of care because he used a broad dynamic compression plate to transfix plaintiff's femoral fracture on February 15, 2002. In his opinion, the plate failed because plaintiff fell while walking and the fall caused the plate to break. Dr. Cavalenes testified that it was not the plate breaking that caused the fall.

Dr. Kregor testified as plaintiff's Rule 213(f)(3) sole controlled expert witness at trial. Dr. Kregor testified that he was a board-certified orthopedic surgeon and chief of orthopedic trauma at the Vanderbilt University Medical Center in Nashville, Tennessee. Dr. Kregor opined that Dr. Cavalenes deviated from the standard of care on February 15, 2002, by using a narrow dynamic compression plate to transfix plaintiff's femoral fracture. He testified that the standard of care required the use of a broad dynamic compression plate. Dr. Kregor's opinion was based on his review of the March 15, 2002, anterior-posterior view x-rays and "the way [the plate] failed."

Both defendants objected to Dr. Kregor testifying as to any opinion or basis not disclosed in plaintiff's Rule 213 disclosures. During a sidebar conference outside the presence of the jury, the trial court advised plaintiff's counsel that if Dr. Kregor's opinions were based on information not previously disclosed, that basis would be stricken.

Subsequent to the sidebar, the following colloquy between Dr. Kregor and plaintiff's counsel took place in the presence of the jury:

"Q:     In your experience as a trauma surgeon, as a scholar, as an author, have you heard of a broad plate failing within a month absent a catastrophic event?

10

[Counsel for Dr. Cavalenes]:     I'll object because I believe that that is a 213 issue.

THE COURT:          Overruled.

A:     I have never seen or even heard of a [broad] plate failing or breaking in the first month after an implantation."

Dr. Kregor then testified that the anterior-posterior view x-rays from March 15, 2002, showed that the holes on the plate where the screws were placed during plaintiff's first surgery were in a straight line, characteristic of a narrow plate, as opposed to a broad plate which has holes alternating side to side from top to bottom.

Dr. Kregor was then asked whether he would have expected a broad plate to fail within a month of implantation, had a broad plate been used. Dr. Kregor answered "no" and Rush objected on grounds that the question had previously been asked and answered and that such testimony violated Rule 213. The trial court sustained the objection stating the question had been asked and answered. Counsel for Dr. Cavalenes moved the trial court to strike Dr. Kregor's answer, and the trial court responded that it understood Dr. Cavalenes was not waiving his objection and that the trial court would conduct a sidebar conference outside the presence of the jury at a later time, and admonish the jury if necessary.

The trial court later held a sidebar conference outside the presence of the jury, where it addressed defendants' objections to Dr. Kregor's testimony that a broad plate would not have failed within a month after implantation as undisclosed material under Rule 213. The trial court afforded plaintiff's counsel an opportunity to read through Dr. Kregor's discovery deposition

11

overnight to locate Dr. Kregor's opinion that a broad plate would not have failed within a month of implantation. The following morning plaintiff's counsel referred the trial court to a portion of Dr. Kregor's deposition testimony contending that the basis at issue had been disclosed. The trial court determined that the timing of the plate failure had not been disclosed as a basis for Dr. Kregor's opinion that a narrow plate had been used, and admonished the jury to disregard Dr. Kregor's testimony that he had "never seen or heard of a broad plate failing or breaking in the first month after an implantation."

On cross-examination, Dr. Kregor testified that a broad plate bears part no. 226-12. Counsel for Dr. Cavalenes then asked Dr. Kregor when the care in question took place, when the lawsuit was filed and when Dr. Kregor was first contacted by plaintiff's counsel to review the case. No objection was made to this line of questioning. In response, Dr. Kregor testified that the medical care in question took place in 2002 and that he was first asked to review this case in 2007. Counsel for Dr. Cavalenes then made reference to how long he had been involved in this matter. Again, no objection was made. Finally, on cross-examination, Dr. Kregor testified that femoral plates that are appropriate in size can also fail.

Terecita Lexamana, a registered nurse, then testified at trial. Lexamana was the circulating nurse for plaintiff's first surgery. She testified that it was her job to "pay attention to what was going on during the procedure" and to prepare the report of the surgery. On this report, Lexamana noted that a "[D]CP plate 226-12" was used. Lexamana wrote this information in the operation report after Dr. Cavalenes decided what plate to use. She testified that she was told that the plate used was a no. 226-12, which is a 12-hole dynamic compression plate, but she never

examined the plate herself.

Plaintiff testified that after her motor vehicle collision she was treated by Dr. Cavalenes at Rush, and that prior to her first surgery Dr. Cavalenes told her that he planned to "rod" her femur. After her surgery, she "was surprised" that Dr. Cavalenes had used a plate rather than an intramedullary rod to transfix her femoral fracture. Plaintiff testified that she was instructed after the first surgery to walk with "toe-touch" weight bearing, which she explained to mean that she was to use weight necessary only to keep her balance while ambulating with the assistance of a walker. Plaintiff was discharged from the hospital on March 1, 2002. On March 15, 2002, she left her apartment intending to go to a bank and descended several steps to do so. She testified that while she was walking her right leg "felt weird" and that her right leg "collapsed."

Dr. Steven Rabin, a board-certified orthopedic surgeon from Aurora, Illinois, testified as Dr. Cavalenes' Rule 213(f)(3) controlled expert witness at trial. In Dr. Rabin's opinion, a broad 12-hole dynamic compression plate was used during plaintiff's first surgery. He testified that the anterior-posterior view x-rays from West Suburban showed that the plate used in plaintiff's first surgery had "staggered" holes. Further, he testified that the 226-12 plate was identified in Laxamana's operation report, and that the hospital bill from Rush identified that a broad 226-12 plate was used.

Dr. Rabin opined that Dr. Cavalenes did not deviate from the standard of care, and that the plate failed due to the forces applied to the plate during normal activity.

Dr. Jeffrey Grosskopf, a board-certified orthopedic surgeon from Geneva, Illinois, testified as Rush's Rule 213(f)(3) controlled expert witness at trial. He opined that Dr. Cavalenes did not

13

deviate from the standard of care in his treatment of plaintiff. His review of the medical records showed that a broad 226-12 plate was used in plaintiff's first surgery. Dr. Grosskopf opined that a plate failure can occur if excessive weight is placed on a plate before a fracture heals. In his opinion, a broad plate would not break within 2 weeks following discharge if proper post-operative instructions were followed. On cross-examination, Dr. Grosskopf testified that if a narrow plate had been used on February 15, 2002, it "would not be surprising" if the plate failed within a short period of time.

### 3. Closing Arguments

During closing argument, counsel for plaintiff argued to the jury that "if the plate broke within 2 weeks from discharge, it couldn't have been the broad plate. The circumstances tell you that. It couldn't have been a broad plate." Plaintiff's counsel also argued that Dr. Cavalenes used a narrow plate because "we know it breaks earlier." Although the defense objected and the trial court sustained the objection, plaintiff's counsel told the jury that "I'm not sure that I believe [Dr. Cavalenes]" because Dr. Cavalenes looked nervous and unsteady during his testimony.

Counsel for Dr. Cavalenes argued in closing that the case involved medical care and treatment in 2002, the lawsuit was filed in 2004, and that it was not until the fall of 2007 that plaintiff developed her theory of the case. Plaintiff objected to this line of argument and the trial court admonished the jury that a closing argument was not evidence, and that the jury should decide the case based on the evidence they heard. Counsel for Dr. Cavalenes then addressed plaintiff's closing argument where plaintiff told the jury that Dr. Cavalenes looked nervous and unsteady during his testimony, and argued that plaintiff's counsel was a "slick lawyer trying to

twist [Dr. Cavalenes'] words." No objection to the reference of "slick lawyer" was made. Finally, counsel for Dr. Cavalenes referred to Dr. Kregor's testimony and said "the [trial] court struck a bunch of other bologna [Dr. Kregor] came up with" as the basis for his opinion that a narrow plate was used in plaintiff's first surgery. No objection to this final statement was made.

In rebuttal, plaintiff's counsel told the jury that this was the first time he had ever been referred to as a "slick lawyer." Plaintiff's counsel then argued that the plate in question broke within an "amazingly" short period of time, and asked the jury to use their common sense in assessing whether two weeks of ambulating with "toe-touch" weight bearing walking is such an extended period of time that they would expect a broad plate to break. Plaintiff's counsel argued that defendants were asking the jury to disregard the testimony that broad plates were designed to last longer than narrow plates.

### 4. Judgment

Judgment was entered on the jury's verdict in favor of defendants and against plaintiff on March 13, 2008. Plaintiff filed a motion for new trial, which was denied. In her motion for a new trial, plaintiff argued that the trial court erred by striking one basis for Dr. Kregor's opinion that a narrow plate was used during plaintiff's first surgery based upon the timing of the plate's failure and by instructing the jury to disregard Dr. Kregor's statement that he had "never seen or heard of a broad plate failing or breaking in the first month after an implantation," and that defense counsel's remarks during closing argument describing plaintiff's attorney as a "slick lawyer" and commenting on the time of the filing of the lawsuit were prejudicial to plaintiff. After the motion for a new trial was denied, this appeal followed.

15

ANALYSIS

On appeal, plaintiff first contends that the trial court erred by striking Dr. Kregor's testimony that he had "never seen or heard of a broad plate failing or breaking in the first month after an implantation." The decision to admit or exclude evidence rests within the sound discretion of the trial court and that decision will not be disturbed absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005). Moreover, a party is not entitled to reversal based upon the trial court's evidentiary rulings unless the error substantially prejudiced the aggrieved party and affected the outcome of the case. *Bosco v. Janowitz*, 388 Ill. App. 3d 450, 462 (2009). The party seeking reversal bears the burden of establishing such prejudice. *Bosco*, 388 Ill. App. 3d at 462.

" 'In a medical malpractice action, a plaintiff must prove: (1) the proper standard of care by which to measure the defendant's conduct; (2) a negligent breach of the standard of care; and (3) that the resulting injury was proximately caused by the defendant's lack of skill or care.' " *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 384 (2004), quoting *Susnis v. Radfar*, 317 Ill. App. 3d 817, 826 (2000). A plaintiff must present expert testimony to establish all three elements. *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 16 (1999).

In the case at bar, plaintiff attempted to prove that Dr. Cavalenes was medically negligent in performing an internal fixation reduction of plaintiff's fractured femur by using a narrow dynamic compression plate to transfix the fracture through Dr. Kregor's testimony. At trial, Dr. Kregor based his opinion that Dr. Cavalenes used a narrow compression plate during plaintiff's

first surgery on his review of the anterior-posterior x-rays taken at West Suburban after the plate had failed and on the timing of the plate's failure. Dr. Kregor testified that a broad plate, if utilized, would not have failed within such a short period of implantation. The trial court struck a portion of the second basis for Dr. Kregor's opinion as undisclosed material in violation of Rule 213 and admonished the jury to disregard Dr. Kregor's testimony that he had "never seen or heard of a broad plate failing or breaking in the first month after an implantation."

Illinois Supreme Court Rule 213 provides in relevant part:

"(f) *Identity and Testimony of Witnesses.* Upon written interrogatory, a party must furnish the identities and addresses of witnesses who will testify at trial and must provide the following information:

\* \* \*

(3) *Controlled Expert Witnesses.* A "controlled expert witness" is a person giving expert testimony who is the party, the party's current employee, or the party's retained expert. For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefore; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case.

(g) *Limitation on Testimony and Freedom to Cross-Examine.* The information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery

deposition, limits the testimony that can be given by a witness on direct examination at trial. Information disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness to prove the information was provided in a Rule 213(f) answer or in the discovery deposition." 177 Ill. 2d R. 213(f)(3), (g). In addition, to the above stated disclosure requirements, subsection (i) of Illinois Supreme Court Rule 213 imposes on each party a continuing duty to inform the opponent of new or additional information when such information becomes known to the party. 177 Ill. 2d Rule 213(i).

The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004), citing *Seef*, 311 Ill. App. 3d at 21; *Warrender v. Millsop*, 304 Ill. App. 3d 260, 265 (1999). The committee comments to Rule 213 explain that, "in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule *** and that no new or additional opinions will be allowed unless the interests of justice require otherwise." 177 Ill. 2d R. 213, Committee Comments. In *Sullivan v. Edward Hospital*, our Illinois Supreme Court stated that its rules were its best efforts to manage the complex and important process of discovery. *Sullivan*, 209 Ill. 2d at 109. "To allow either side to ignore Rule 213's plain language defeats its purpose and encourages tactical gamesmanship." *Sullivan*, 209 Ill. 2d at 110, citing *Department of Transportation v. Crull*, 294 Ill. App. 3d 531, 537 (1998). This court has stated that Rule 213 establishes more exacting standards that it predecessor, Rule 220, which formerly governed expert witnesses. *Susnis*, 317 Ill. App. 3d at 828-29. "Trial courts should be more reluctant under Rule 213 than they were

18

under former Rule 220 to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur." *Susnis*, 317 Ill. App. 3d at 828-29.

A witness may elaborate on a properly disclosed opinion. *Becht v. Palac*, 317 Ill. App. 3d 1026, 1037 (2000). The fact that trial testimony is more precise than the opinion as originally disclosed does not necessarily result in a violation. *Seef*, 311 Ill. App. 3d at 23. However, the witness's testimony must be encompassed by the original opinion. *Becht*, 317 Ill. App. 3d at 1037. The testimony cannot state new reasons for the opinion. *Barton v. Chicago & North Western Trans. Co.*, 325 Ill. App. 3d 1005, 1039 (1999). However, a logical corollary to an opinion or a mere elaboration of the original statement is acceptable. *Seef*, 311 Ill. App. 3d at 21. The proponent of the evidence has the burden to prove that the opinions were provided in an answer to a Rule 213 interrogatory or in the witness' discovery deposition. *Seef*, 311 Ill. App. 3d at 22.

As noted, the trial court struck one basis for Dr. Kregor's opinion in this case, and instructed the jury to disregard Dr. Kregor's statement that "I have never seen or heard of a broad plate failing or breaking in the first month after implantation." In her brief to this court, plaintiff argues that "[d]uring both written and oral pretrial discovery, [Dr.] Kregor's opinion was that in the absence of any evidence of a catastrophic event, the narrow plate in the plaintiff's right femur failed." At oral argument before this court, plaintiff argued that the stricken basis for Dr. Kregor's opinion that Dr. Cavalenes used a narrow plate was encompassed by the disclosures in both plaintiff's answers to the Rule 213 interrogatories and during Dr. Kregor's discovery

19

deposition. Plaintiff points this court to both her answers to the Rule 213 interrogatories and the following exchanges between Dr. Kregor and counsel for Dr. Cavalenes at Dr. Kregor's deposition, contending that the basis for Dr. Kregor's opinion which was struck by the trial court was properly disclosed:

"Q:     Okay.  Now, for lack of a better term, you would agree with me that femoral plates that are the appropriate size for a patient can fail?

A:     Yes.

Q:     And broad plates utilized to repair mid-shaft femoral fractures can fail within a month of the original surgical procedure without any negligence on the part of the operating surgeon?

A:     I'd like to break that down into parts.  By that I mean I would say that….

Q:     Then let me withdraw and see if I can break it down for you. How's that?

A:     Okay."

The following exchange subsequently took place between Dr. Kregor and counsel for Dr. Cavalenes:

"Q:     Placing excess weight on a plated femoral fracture within the first month of repair can lead to damage to the plate?

A:     Theoretically, yes.  I will tell you that in practice that's extremely unusual."

20

We cannot find that the trial court abused its discretion by finding that the stricken basis for Dr. Kregor's opinion was previously undisclosed in violation of Rule 213. The only basis disclosed in plaintiff's answer to 213 interrogatories for Dr. Kregor's opinion that a narrow plate was utilized by Dr. Cavalenes in plaintiff's first surgery, was Dr. Kregor's review of the "available medical images." At another point in plaintiff's 213 disclosures, plaintiff disclosed Dr. Kregor's opinion that the plate used to transfix plaintiff's femoral fracture failed in the absence of a catastrophic event. Nowhere in plaintiff's answers to Rule 213 interrogatories does plaintiff indicate that one basis for Dr. Kregor's opinion that Dr. Cavalenes used a narrow plate because of the timing of the plate failure. When Dr. Kregor opined that it is extremely unusual that placing excess weight on a plated femoral fracture within the first month of repair would lead to damage to the plate, it is not the same as saying "I have never seen or even heard of a [broad] plate failing or breaking in the first month after an implantation."

At his discovery deposition, Dr. Kregor testified that the anterior-posterior view x-rays taken at West Suburban after the affixed plate had failed showed that a narrow plate was used because the screws used to secure the plate to plaintiff's femur appeared to form a straight line and the plate appeared narrow. When asked whether Dr. Kregor had rendered every basis for his opinions, Dr. Kregor responded that he had.

We are not persuaded by plaintiff's argument that her answers to the Rule 213 interrogatories or the above quoted colloquy encompassed the stricken basis for Dr. Kregor's opinion that a narrow compression plate had been used during plaintiff's first surgery. If plaintiff wished to have Dr. Kregor testify at trial that a broad plate would not have failed within a month

21

after implantation, plaintiff had the responsibility to elicit that opinion at Dr. Kregor's deposition or place it in the 213 responses.

Furthermore, as noted, the trial court granted both defendants motions *in limine* to bar Dr. Kregor from providing any opinion or basis therefore which was not previously disclosed. The purpose of a motion *in limine* is to permit a party to obtain an order before trial excluding inadmissible evidence and prohibiting interrogation concerning such evidence without the necessity of having the questions asked and objections thereto made in the presence of the jury. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 792 (1992). In this way, the moving party is protected from whatever prejudicial impact the mere asking of the questions and the making of objections may have upon the jury. *Rutledge*, 230 Ill. App. 3d at 792.

Plaintiff does not appear to argue that the sanction of striking the testimony constituted an abuse of discretion as a result of the discovery violation. Plaintiff's nearest contention in this regard is the following statement contained in her brief to this court: "[t]he trial court's erroneous evidentiary ruling could have, and most likely did, affect the outcome of the trial." This cursory argument does not meet the standard of Illinois Supreme Court Rule 341(e)(7) (210 Ill. 2d R. 341(e)(7)), which requires plaintiff to put forth reasons for her argument. We need not sift through the record to find support for plaintiff's contention. *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 52 (2005). As a result of plaintiff's failure to raise the argument and failure to develop the argument if that was her intention, any such contention is waived. 210 Ill. 2d R. 341(h)(7), (e)(7). Waiver aside, we find that the striking of Dr. Kregor's testimony was a proper sanction. *Flynn v. Ryan*, 199 Ill. 2d 430, 438 n.1 (2002) (waiver is an admonition to the parties,

not a limitation upon the powers of courts of review).

In determining whether the exclusion of testimony is an appropriate sanction for nondisclosure, a trial court must consider the following factors: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. *Sullivan*, 209 Ill. 2d at 110. The decision of whether or not to impose sanctions lies within the sound discretion of the trial court, and that decision will not be reversed absent an abuse of discretion. *Sullivan*, 209 Ill. 2d at 110-11.

The record establishes that, regarding the first factor, defendants were clearly surprised by Dr. Kregor's stricken testimony. As noted, the stricken testimony was not disclosed prior to trial, in plaintiff's answers to Rule 213 interrogatories or during Dr. Kregor's discovery deposition. Regarding the second and third factors, the prejudicial effect of the testimony is manifest. Dr. Kregor's stricken testimony was that he believed a narrow compression plate was used during plaintiff's first surgery because a broad plate would not have failed within a month of implantation. This was a basis for Dr. Kregor's opinion of which defendants should have been informed. Without being informed of that basis, defendants would have no ability to present evidence to the contrary and this would be prejudicial. The defense in a medical malpractice case must have the opinions of plaintiff's expert in order to prepare their defense. Likewise, the plaintiff is entitled to all of the defense's expert opinions so they can have their experts address those opinions. The nature of the testimony in the case at bar would provide evidence and an argument to the jury that the defense would not have been able to counteract because they were

23

not prepared or given notice that it was a basis used by plaintiff's expert in formulating his opinion. Regarding the fourth and fifth factors, the record shows that defendants were diligent in sending their Rule 213 interrogatories to plaintiff and that defendants timely objected to the contested testimony both by filing motions *in limine* to bar such testimony and by objecting at trial. Concerning the sixth factor, we cannot make a determination that plaintiff's failure to disclose the stricken testimony indicated a lack of good faith based on the record before us.

Because five of the six factors weigh in favor of the trial court's decision to strike the contested portion of Dr. Kregor's testimony, we cannot find an abuse of discretion. Again, the purpose behind Rule 213 is to avoid surprise and to discourage tactical gamesmanship. *Sullivan*, 209 Ill. 2d at 111. As this court has stated before, "we strongly urge practitioners that, if an opinion is important to the theory of one's case, it is essential that it and any basis therefore be disclosed. This is a bright line rule and must be followed." *Seef*, 311 Ill. App. 3d at 24. Here, the trial court properly found that the stricken testimony had not been previously disclosed and properly struck that testimony by adhering to the bright line rule.

We note further that even if the stricken basis had been properly disclosed, Dr. Kregor's testimony, "I have never seen or heard of a broad plate failing or breaking in the first month after implantation," as a basis for his opinion that Dr. Cavalenes utilized a narrow plate was questionable. In a medical malpractice action, expert testimony is necessary to establish: (1) the standard of care expected of the medical provider and (2) the provider's deviation from the standard. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 298 (2000); *Jackson v. Graham*, 323 Ill. App. 3d 766, 775 (2001). In determining the appropriate standard of care,

24

Illinois follows the "similar locality" rule, "which requires physicians to possess and apply the knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case." *Jackson*, 323 Ill. App. 3d at 775, citing *Slezak v. Girzadas*, 167 Ill. App. 3d 1045, 1052 (1988). In *Purtill v. Hess*, 111 Ill. 2d 229, 246 (1986), our Illinois Supreme Court recognized that because "there are today relatively uniform standards for the education and licensing of physicians," courts should read the "similar locality" rule broadly. The issue in *Purtill* was whether a physician's affidavit filed in opposition to the defendant's summary judgment motion demonstrated the affiant's familiarity with the applicable standard of medical care. *Purtill*, 111 Ill. 2d at 243. In his affidavit, the physician admitted a lack of knowledge regarding the standard of care applicable to physicians in the same community or similar communities in which the defendant practiced medicine. *Purtill*, 111 Ill. 2d at 244. The trial court struck the affidavit and granted summary judgment in the defendant's favor, and the appellate court affirmed that decision. *Purtill*, 111 Ill. 2d at 239.

On appeal to our Illinois Supreme Court, the plaintiff in *Purtill* urged the court to reconsider the "similar locality" rule. *Purtill*, 111 Ill. 2d at 246. Although the court refused to abolish the rule, it reversed the trial and appellate courts, holding that an expert need not be familiar with the standard of medical care in a particular community when a nationally uniform, minimum standard exists and the expert is familiar with that standard. *Purtill*, 111 Ill. 2d at 247. The *Purtill* court held that an expert will be qualified to testify as to the standard of care in a medical malpractice case if (1) the expert is familiar with the standards of care applicable to a reasonably well-qualified physician in the same or similar locality of treatment *or* (2) certain

25

nationally uniform, minimum standard exist despite the locality of treatment, and the expert is familiar with those standards. *Purtill*, 111 Ill. 2d at 246-47.

Here, the stricken basis for Dr. Kregor's opinion did not establish any community standard, but was only an expression of Dr. Kregor's personal experience. He was not referring to a community standard. Had the stricken basis been properly disclosed pursuant to Rule 213, the basis may have been properly barred as an improper basis unless it was tied up to a community standard.

We now proceed to plaintiff's argument that the trial court abused its discretion by denying her posttrial motion for a new trial based upon Dr. Cavalenes' counsel's prejudicial remarks during cross-examination of Dr. Kregor and during closing arguments. Specifically, plaintiff argues that she was denied a fair trial when counsel for Dr. Cavalenes questioned Dr. Kregor regarding the timing of the medical care in question, the timing of the lawsuit, and the timing of Dr. Kregor's retention as plaintiff's expert witness. Plaintiff further argues that counsel's comment, also made during his cross-examination of Dr. Kregor, regarding the length of his involvement in the case as compared to the length of Dr. Kregor's involvement was prejudicial. Counsel for Dr. Cavalenes emphasized Dr. Kregor's answers to the above questions in closing argument by stating that defendants were required to wait three and one-half years for plaintiff to develop her theory of the case. Finally, plaintiff argues that counsel's reference to plaintiff's attorney as a "slick lawyer," who was attempting to twist the words of Dr. Cavalenes denied her a fair trial.

" 'Although improper argument and attorney misconduct can be the basis for granting a

26

new trial, that determination is left to the sound discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion.' " *First National Bank of La Grange v. Glen Oaks Hospital & Medical Center*, 357 Ill. App. 3d 828, 833 (2005), quoting *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483, 223 Ill. Dec. 750 (1997). "In arguing a case to the jury, counsel is allowed broad latitude in drawing reasonable inferences and conclusions from the evidence." *Friedland v. Allis Chalmers Co. of Canada*, 159 Ill. App. 3d 1, 5 (1987). Questions as to the prejudicial effect of remarks in closing statements are within the discretion of the trial court and the results are affirmed absent an abuse of discretion. *Simmons v. Garces*, 198 Ill. 2d 541 (2002). Even improper arguments will not warrant reversal without a substantial showing of prejudice. *Magna Trust Co. v. Illinois Central R.R. Co.*, 313 Ill. App. 3d 375, 397 (2000). Parties are entitled to a fair trial, not a perfect trial. *Buszyna v. Cuomo & Son Cartage Co.*, 146 Ill. App. 3d 404, 420 (1986).

The standard of reviewing a claim of improper argument is whether the argument was of such a character as to have prevented a fair trial. *Cooper v. Chicago Transit Authority*, 153 Ill. App. 3d 511, 524 (1987). The trial court is in a unique position to gauge the effects of misconduct, having heard all of the testimony and arguments and having observed the parties and their effect on the jury. *Cooper*, 153 Ill. App. 3d at 523. " 'The attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel.' " *First National Bank of La Grange*, 57 Ill. App. 3d at 833, quoting *Zuder v. Gibson*, 288 Ill. App. 3d 329, 338, 680 N.E.2d 483, 223 Ill. Dec. 750 (1997). Where the jury

hears an improper comment by counsel, the trial court's prompt action in sustaining an objection can cure the possible error. *Cooper*, 153 Ill. App. 3d at 524. Where, as here, the trial court tells the jury that closing arguments are not evidence, the scope and character of the arguments are left to the trial court and will not be reversed absent an abuse of discretion. *Rockwood v. Singh*, 258 Ill. App. 3d 555, 558 (1993). In addition, if the trial was fair as a whole and the evidence was sufficient to support a jury's verdict, a case will not be reversed upon review. *First National Bank of La Grange*, 357 Ill. App. 3d at 833.

We first note that the only objection made to the complained-of remarks was when counsel for Dr. Cavalenes commented during closing argument that defendants were required to wait three and one-half years for plaintiff to develop her theory of the case. Further, plaintiff failed to raise the only objected-to conduct in her posttrial motion. Illinois law is clear that both an objection and a written posttrial motion raising an issue are necessary to preserve any error for appellate review. *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 287 (2009).

Plaintiff invokes the plain error doctrine to support reversal of the trial court's denial of her posttrial motion for a new trial. Although a plain error theory may be applied in civil cases (*Palanti v. Dillon*, 303 Ill. App. 3d 58, 66 (1991), citing *Belfield v. Coop*, 8 Ill. 2d 293, 313 (1956)), the plain error doctrine finds greater application in criminal cases (*Gillespie v. Chrysler Motors Corporation*, 135 Ill. 2d 363, 375 (1990)), and is "applied in civil cases only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." *In re Marriage of Saheb*, 377 Ill. App. 3d at 627. "As civil trials 'do not implicate sixth amendment concerns, the

28

application of the plain error doctrine to civil cases should be exceedingly rare.' " *Palanti*, 303 Ill. App. 3d at 66.

In support of her argument that defense counsel's cross-examination of Dr. Kregor and closing argument regarding the timing of the lawsuit and retention of Dr. Kregor as an expert denied her a fair trial, plaintiff argues that "if the jury believed that the timing of the filing in relation to an incident or when an expert is retained somehow related to the merits of her case, then those remarks were not harmless and could have affected the outcome of the trial." We cannot find that the trial court abused its discretion by denying plaintiff's posttrial motion for a new trial based upon these comments. Upon plaintiff's objection to defense counsel's argument that defendants were required to wait three and one-half years for plaintiff to develop her theory of the case, the trial court admonished the jury that closing arguments were not evidence, and that the jury should decide the case based on the evidence alone. The trial court's instruction was sufficient to cure any alleged error.

Further, we cannot find that defense counsel's isolated reference to plaintiff's counsel as a "slick lawyer," which plaintiff's counsel repeated in rebuttal argument, affected the outcome of trial.

A lawyer is obligated to zealously represent a client, but within the bounds of the rules of law. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 794 (1992). Attacks on the honesty of a party's counsel in closing argument have been held to be reversible error. *Hubbard v. McDonough Power Equipment, Inc.*, 83 Ill. App. 3d 272, 283 (1980) (it is improper to impugn the honesty of a litigant's attorney); *Cecil v. Gibson*, 37 Ill. App. 3d 710, 712 (1976) (reversal

29

warranted when defense counsel referred to plaintiff's counsel as a "slick attorney from Chicago" and plaintiff's expert witness as a "slick hired gun"). Furthermore, improper comments from counsel during closing argument can be so overwhelmingly prejudicial despite an objection and the trial court's sustaining of that objection when the prejudicial comments are to an extent that the parties cannot receive a fair trial. See *Rutledge*, 230 Ill. App. 3d at 794 (plaintiff denied a fair trial even when the trial court sustained plaintiff's objections and admonished the jury to disregard defense counsel's comments); *Belfield v. Coop*, 8 Ill. 2d 293 (1956).

In *Belfield v. Coop*, our Illinois Supreme Court found that reversal was warranted based upon the plaintiff's closing argument despite the defendants' failure to object. In closing argument, the defendant in *Belfield* were characterized as "thieves," "usurpers," and "defrauders." Repeated references were also made regarding one of defendants' counsel as "Sammy" Saxon, and further argued that Saxon was not a reputable attorney. Our Illinois Supreme Court explained that "the plaintiff's attorneys not only belittled opposing counsel, and their standards of ethics and conduct; one of plaintiff's counsel, a county judge from a neighboring county, inferred that his client should win the case because he was a judge and had extensive experience with the law." The court found that "so much of this argument was prejudicial and unwarranted that a duty devolved upon the court to inject itself into the proceedings sufficient to see that the litigants received a fair trial." *Belfield*, 8 Ill. 2d 293.

This case does not find comparison to *Belfield*. The complained of comment here must be considered in context. Prior to defense counsel's reference to plaintiff's attorney as a "slick lawyer trying to twist [Dr. Cavalenes'] words," plaintiff's counsel in closing argument asserted his

30

personal opinion as to the credibility of Dr. Cavalenes, arguing to the jury that "I'm not sure that I believe [Dr. Cavalenes]" because Dr. Cavalenes appeared nervous and unsteady during his testimony. The argument offered by plaintiff's counsel has in itself been held to be improper. See *Chuhak v. Chicago Transit Authority*, 152 Ill. App. 3d 480, 492 (1987) (an attorney may not assert his personal opinion as to the credibility of a witness).

We cannot disturb the trial court's denial of plaintiff's motion for a new trial based upon defense counsel's isolated reference to plaintiff's attorney as a "slick lawyer trying to twist [Dr. Cavalenes'] words." This reference was made in response to plaintiff's counsel's assertion of his personal opinion as to the credibility of Dr. Cavalenes, and was a response to plaintiff's counsel's personal belief that Dr. Cavalenes was not credible. The trial court was able to observe the effect of the improper comments on the jury, and was in a position vastly superior to determine whether the improper comments denied plaintiff a fair trial. The trial court determined that the comments did not deny plaintiff a fair trial, and based upon the record before us, we cannot disturb that ruling.

We do not wish to condone defense counsel's behavior. The reference to plaintiff's counsel as a "slick lawyer" was improper, and an impermissible personal attack against the integrity of plaintiff's counsel. Under a different set of circumstances defense counsel's reference to plaintiff's attorney as a "slick lawyer," may have warranted reversal. However, in this case, although we disapprove of defense counsel's reference to plaintiff's counsel as a "slick lawyer," based upon the record before us, we cannot find that the isolated reference denied plaintiff a fair trial.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.