**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190292-U

Order filed March 2, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| CENTRAL/SOUTHERN ILLINOIS SYNOD OF THE EVANGELICAL LUTHERAN CHURCH IN AMERICA, | ) ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0292 Circuit No. 16-CH-243 |
| TRINITY LUTHERAN CHURCH OF KANKAKEE, JOHN EDWARDS, and CECILIA CAMPBELL-WATSON, | ) ) ) ) ) | Honorable Adrienne W. Albrecht, |
| Defendants-Appellants. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Daugherity and Lytton concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The court did not err in granting summary judgment in favor of the plaintiff.

¶ 2     The defendants, Trinity Lutheran Church of Kankakee (Trinity Lutheran), John Edwards, and Cecilia Campbell-Watson, appeal the circuit court's granting of summary judgment in favor of the plaintiff, Central/Southern Illinois Synod of the Evangelical Lutheran Church in America (the Synod).

¶ 3                            I. BACKGROUND

¶ 4        The Evangelical Lutheran Church in America (ELCA) is made up of many judicatories across the U.S. The Synod is one such judicatory and consists of 76 congregations in central and southern Illinois. Trinity Lutheran was one of the congregations of the Synod. In sum, the ELCA is a hierarchical religious organization in which the full ELCA is the highest, the Synod is an intermediary, and congregations, such as Trinity Lutheran, are the lowest. Edwards and Campbell-Watson were members of the Trinity Lutheran congregation.

¶ 5        This case concerns real property located at 1501 East Merchant Street in Kankakee, Illinois. While the deed of such property is not in the record, it appears that the property, including a church building, was titled in the name of Trinity Lutheran Church of Kankakee, an Illinois not-for-profit corporation. The basic facts of the case are as follows: in 2013, Trinity Lutheran's active membership had dropped to between 12 and 14. The church had been receiving substantial financial assistance from the ELCA and the Synod, but such support was terminated in 2014, when Trinity Lutheran failed to turn in the necessary paperwork. At this time, Trinity Lutheran's pastor resigned, and the Synod appointed Reverend Robert Ervin. Edwards did not like Ervin. On January 25, 2016, Edwards changed the locks on the building and locked Ervin out. Edwards refused to let Ervin or the Synod access the property. No worship services of Trinity Lutheran were held after this point, though Edwards rented the building to another church.

¶ 6        In March 2016, the Synod Council met regarding Trinity Lutheran. The constitution of Trinity Lutheran provided that "if the congregation ceases to exist, title to undisposed property shall pass to the [Synod]." The Synod's constitution stated:

            "If any congregation of this synod has disbanded, or if the members of a
            congregation agree that it is no longer possible for it to function as such, or if it is

                                        2

the opinion of the Synod Council that membership of a congregation has become so scattered or so diminished in numbers as to make it impractical for such a congregation to fulfill the purposes for which it was organized or that it is necessary for this synod to protect the congregation's property from waste and deterioration, the Synod Council, itself or through trustees appointed by it, may take charge and control of the property of the congregation to hold, manage, and convey the same on behalf of this synod. The congregation shall have the right to appeal the decision of the Synod Assembly."

Pursuant to these constitutional provisions, the Synod Council voted to take charge and control of the property and assets of Trinity Lutheran, finding that the membership of the congregation had become so scattered or diminished in numbers as to make it impractical for the congregation to fulfill the purposes for which it was organized. Edwards still refused to provide access to the building.

¶ 7        In November 2016, the Synod filed a complaint to quiet title and for possession of the real property and assets of Trinity Lutheran. The defendants filed an answer, in which they raised, *inter alia*, "affirmative defenses" stating that the Synod had not exhausted administrative remedies because they had not given the defendants the opportunity to appeal its decision to take possession to the ELCA.

¶ 8        The Synod filed a motion for summary judgment on November 13, 2018. The Synod argued that its decision to take charge and control of Trinity Lutheran must be given deference under the ecclesiastical abstention doctrine, and Edwards and Campbell-Watson had no individual rights to any of the assets. The motion stated that, since there was no longer a congregation or

3

pastor at Trinity Lutheran, the Synod was required under its constitution to take charge and control over Trinity Lutheran and wind down its affairs.

¶ 9 Attached to the petition was a deposition of Bishop S. John Roth conducted in Peoria in August 2018. At the start of the deposition, the Synod stated that notice of the deposition was sent to Edwards, but he was not in attendance. Roth was elected bishop in 2011 and re-elected in 2017. As a bishop, he was the general episcopal oversight for the congregations and pastors and helped the congregations live within the constitutional frameworks of the congregation, the Synod, and the ELCA. He was also in charge of hiring the pastor for the church. Trinity Lutheran could not hire a pastor without the approval of Bishop Roth. The top mission and priority of Trinity Lutheran was to provide worship services.

¶ 10 Roth stated that from the early to mid-2000s forward, Trinity Lutheran's numbers were dwindling and there was a lot of contention among the congregation. He stated that it would be very unusual for a church of its size to be able to financially support and sustain a congregation, so Trinity Lutheran had received significant subsidies. Over a period of approximately 18 years, Trinity Lutheran had received around $400,000 in financial assistance, which was significantly more than any other congregation. The second highest amount of money provided to a congregation over the same amount of time, was $90,000. By 2013, Roth stated that there had to be a dramatic change in circumstances for there to be any future for the congregation. In 2013, Trinity had income of approximately $44,851, which included a $24,000 subsidy from the ELCA. Its annual expenses were around $44,000. While Trinity Lutheran no longer received financial assistance after failing to turn in the proper paperwork in 2014, Roth stated that he and the Synod continued to address the issues of conflict and work with the congregation to create a plan for moving forward. By early 2015, Roth stated that there was no longer a church governing structure.

4

¶ 11    At a September 2015 meeting, the Synod Council considered taking control over Trinity Lutheran. However, Roth asked the Council to give him more time to work with the congregation to restore order and develop a plan. After the meeting, Roth met with some members of Trinity Lutheran to talk about keeping the congregation alive. Roth said that they went over the difficulties with the financial position of the congregation and the options. He told them that if they did not work it out together, the Synod would take over the building and assets. It was after this discussion that Edwards changed the locks on the building. Roth stated that Edwards had no authority over Trinity Lutheran.

¶ 12    Roth stated that the Synod Council adopted its resolution to take control of the property based on: (1) the absence of any congregational services of worship by Trinity Lutheran, (2) the fact that there was no longer a congregational council to carry on a governance structure of Trinity Lutheran in order to meet its constitutional requirements, (3) the absence of an annual meeting of the congregation, and (4) the necessity to preserve the property. Roth stated that the Synod was concerned about the state of the property because the building was deteriorating: the windows would not lock or close properly, the heating unit was not functioning for the main worship area, there were broken windows high up where rain could come in, and there were issues with the roof.

¶ 13    The defendants filed a response to the Synod's motion for summary judgment and a cross-motion for summary judgment. The motion solely attached an affidavit of Campbell-Watson; no deed or other documents were attached.

¶ 14    After a hearing on the cross-motions for summary judgment on February 19, 2019, the court issued a written decision granting summary judgment to the Synod. In doing so, the court stated, in part:

5

"According to all of the organizational documents, the [S]ynod has the authority to declare a congregation no longer viable, disband it, and assume possession of all its assets. According to testimony of Bishop Roth, the [S]ynod, following proper procedure, did declare Trinity Lutheran Church of Kankakee no longer viable and ordered it to wind up its affairs. After that occurrence, the individual defendants, particularly John Edwards, changed the locks on the church building and, without proper authority, assumed control of the congregation assets. Further, at no time did John Edwards or Cecilia Campbell-Watson have authority, within the constitution and bylaws of the congregation or of the [S]ynod, to assume control over the congregation or of the building."

The court further stated that the merits of the decision to declare the congregation no longer viable and order it to wind down its affairs was one the court could not examine by virtue of the ecclesiastical abstention doctrine.

¶ 15    The defendants filed a motion to reconsider arguing, in part, that the court should not have considered Bishop Roth's deposition because the deposition was taken in Peoria instead of Kankakee County and the defendants were not present. The court denied the motion.

¶ 16                                   II. ANALYSIS

¶ 17    On appeal, the defendants primarily argue the court erred in granting the motion for summary judgment in favor of the Synod. The defendants also argue that the court erred in considering the deposition of Roth; the filing of a motion to reconsider should have stayed enforcement of the judgment; they should have been given the opportunity to exhaust all administrative remedies before the Synod brought litigation; and the ELCA, not the Synod, was the proper party to bring this litigation.

6

¶ 18      By filing cross-motions for summary judgment, the parties agreed that only a question of law existed that the court could decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. We review the court's decision on cross-motions for summary judgment *de novo*. *Id.* ¶ 30. We review the judgment, not the reasoning, of the circuit court, and we may affirm on any grounds in the record. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 19      The role of courts in resolving church property disputes is narrowly circumscribed by the first amendment's guarantee that the right to the free exercise of religion will not be abridged. *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 713 (1991). Courts, thus, have no authority to resolve disputes that concern matters of church doctrine, practice, polity, or administration. *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). Likewise, where hierarchical religious organizations have established their own rules, regulations, and tribunals for adjudicating their own disputes concerning the government and direction of subordinate bodies, courts are required to defer to such decisions. *Id.* at 724-25. Where the church dispute is not doctrinal, deference to the religious authority is not required. *Jones v. Wolf*, 443 U.S. 595, 602 (1979). Courts in such instances have generally applied the "neutral principles of law" approach. *Id.* at 602-03. "Under the neutral-principles approach, the court objectively examines pertinent church charters, constitutions and bylaws, deeds, State statutes, and other evidence and resolves the matter the same as it would a secular dispute." *Tanios*, 213 Ill. App. 3d at 714. However, the neutral principles of law approach does not always allow a court to resolve a dispute. *Id.* "[I]f examination and interpretation of the documents pertinent to the dispute necessarily would entail deciding an issue of religious doctrine or church law, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* at 714-15.

¶ 20    Here, the Trinity Lutheran Church was a member of the hierarchical church organization of the ELCA. In the hierarchy, Trinity Lutheran was a member of the Synod. The Synod was one of the judicatories that made up the full ELCA. Thus, Trinity Lutheran answered to the Synod in the church hierarchy. Synod's constitution provided:

> "If any congregation of this synod has disbanded, or if the members of a congregation agree that it is no longer possible for it to function as such, or if it is the opinion of the Synod Council that membership of a congregation has become so scattered or so diminished in numbers as to make it impractical for such a congregation to fulfill the purposes for which it was organized or that it is necessary for this synod to protect the congregation's property from waste and deterioration, the Synod Council, itself or through trustees appointed by it, may take charge and control of the property of the congregation to hold, manage, and convey the same on behalf of this synod. The congregation shall have the right to appeal the decision of the Synod Assembly."

The constitution of the Trinity Lutheran Church provided that "if the congregation ceases to exist, title to undisposed property shall pass to the [Synod]." Pursuant to both constitutions, the Synod Council determined that Trinity Lutheran was no longer viable and, thus, ceased to exist. Such a decision was within the province of the Synod Council and is an ecclesiastical matter involving church doctrine, polity, and practice. Therefore, we will defer to such a finding. Looking at the plain language of both constitutions, once the Synod Council made such a finding, title to the property reverted to the Synod. The court did not err in granting summary judgment in favor of the Synod.

8

¶ 21    We find support for this decision in *Clay v. Illinois District Counsel of Assemblies of God Church*, 275 Ill. App. 3d 971 (1995). In *Clay*, the Grafton Assemblies of God Church was a member of the hierarchical organization of the Illinois District Counsel of Assembles of God Church. *Id.* at 973. The bylaws of the Grafton Assembly stated that if it "cease[d] to function as an Assemblies of God Church" its property would revert to the Illinois District Council. *Id.* at 973-74. When the Grafton Assembly's membership dropped to eight, the Illinois District Council voted to close the church and sell its property. *Id.* at 974-75. The remaining members of the church brought suit, seeking to void the transfer of the real estate. *Id.* at 975. The circuit court granted the Illinois District Council's motion for summary judgment, finding that the plain language of the bylaws granted the Illinois District Council authority to convey the real estate. *Id.* The appellate court upheld the granting of summary judgment, stating:

> "[T]he reversion clause in the Grafton Assembly's bylaws did not condition reversion of its property to the Illinois District Council on some objectively ascertainable fact, such as whether the Illinois District Council had decertified the Grafton Assembly for affiliation with the Illinois District Council. Instead, the reversion of the Grafton Assembly's property was conditioned on the fact the Grafton Assembly had 'cease[d] to function as an Assemblies of God Church.' It is not the province of a civil court to decide whether plaintiffs are still functioning as a church, or whether they are still functioning as an Assemblies of God Church." *Id.* at 979.

Thus, the court deferred to the Illinois District Council's decision on that issue. *Id.* The court then looked at the plain language of the bylaws and found that, because the Grafton Assembly had

9

ceased to function as an Assemblies of God Church, title passed to the Illinois District Council. *Id.*

¶ 22          In coming to this conclusion, we reject the defendants' argument that the neutral principles of law analysis requires us to solely look at the deed and not consider any of the church doctrine. As stated above (*supra* ¶ 19), even where applying the neutral principles of law analysis, the law requires the court to look at the church doctrine and not decide any ecclesiastical issue, as we would have to do here. Moreover, we note that, while the defendants reference the deed many times in their briefs, the deed is not included in the record on appeal. It is the appellant's burden to provide a sufficient record on appeal. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 23          The defendants next raise a number of meritless arguments, which we will consider in turn. First, the defendants argue that the court should not have considered the deposition of Bishop Roth because it was taken in Peoria instead of Kankakee County. The defendants raised this argument for the first time in the motion to reconsider. Therefore, it has been forfeited. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36; *Sewickley, LLC v. Chicago Title Land Trust Co.*, 2012 IL App (1st) 112977, ¶¶ 36-37 ("To allow defendants to raise objections *** for the first time in a motion for rehearing and reconsideration would require this court to ignore long-standing precedent on how issues are litigated both in the circuit court and before this court."). The defendants could have objected to the inclusion of such evidence in its response to the motion for summary judgment or at the hearing but failed to do so.

¶ 24          Second, the defendants argue that a judgment deed was given before the defendants filed their motion to reconsider and it "was error for the court to enforce its judgment without giving defendants time to ask the court to reconsider its judgment." The defendants do not cite any

caselaw for this proposition. We cannot see how the defendants were harmed by such where they did file a motion to reconsider.

¶ 25    Third, the defendants argue that the Synod had to give the defendants the opportunity to exhaust administrative remedies by appealing to the ELCA before it brought a case in court. While the defendants raised this argument in their initial response to the Synod's complaint, they did not raise it again in the trial court, either in their response to the motion for summary judgment, at the hearing, or in the motion to reconsider. The defendant has, therefore, forfeited this issue. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855 (2010). Even accepting this forfeiture, the defendants made no effort to appeal the finding of the Synod Council. The Synod could not be expected to wait indefinitely for the defendants to appeal before seeking to enforce its judgment.

¶ 26    Lastly, the defendants argue that the ELCA, not the Synod, should have brought the complaint because, according to the defendants, courts must "defer to the resolution of issues of religious doctrine and practice to the *highest court of the hierarchical church* organization." (Emphasis in original.) Again, the defendants have forfeited this argument by not raising it in the circuit court. *Bank of New York Mellon v. Rogers*, 2016 IL App (2d) 150712, ¶ 32. Nonetheless, we note that the defendants' argument is based on a misreading of the law. The law requires us to give deference "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories *to which the matter has been carried*." (Emphasis added.) *Watson v. Jones*, 80 U.S. 679, 727 (1871). As the defendants did not appeal to the ELCA, the Synod was the highest judicatory to which the matter was carried.

¶ 27                                      III. CONCLUSION

¶ 28    The judgment of the circuit court of Kankakee County is affirmed.

¶ 29    Affirmed.

11