# Illinois Official Reports

## Appellate Court

---

### *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278

---

| | |
|---|---|
| Appellate Court Caption | MARGARET BAUMRUCKER, Plaintiff-Appellee, v. EXPRESS CAB DISPATCH, INC., d/b/a Express Cab Company, EXPRESS CAB COMPANY, INC., d/b/a Express Cab Company, and LUIS LEAL, Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-16-1278 |
| Filed | July 18, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-6839; the Hon. Michael R. Panter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Rostyslaw J. Smyk and Daniel L. Polsby, of Ruberry, Stalmack & Garvey, LLC, of Chicago, for appellants.<br><br>Michael T. Reagan, of Law Offices of Michael T. Reagan, of Ottawa, and Joseph P. Shannon and Patrick D. Cummings, of Shannon Law Group, of Woodbridge, for appellee. |

Panel                  PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Mason concurred in the judgment and opinion.

**OPINION**

¶ 1        Three weeks after Express Cab Dispatch, Inc., and Express Cab Company, Inc. (collectively, Express Cab), leased Luis Leal a taxi cab, he hit a pedestrian, Margaret Baumrucker, while she was walking to her job at MacNeal Hospital in Berwyn. Although Leal was driving at a slow speed, he knocked Baumrucker to the ground, injuring her left shoulder. Baumrucker has had years of physical therapy, and according to her physician, the shoulder injury is permanent and will likely cause her pain and restrict some activities for the rest of her life.

¶ 2        Baumrucker sued Express Cab alleging negligence and willful and wanton entrustment of the cab to Leal. She sued Leal for negligence. Baumrucker argued that Express Cab acted recklessly by failing to check Leal's driving record, which would have shown that while living out of state, he had been convicted of driving while intoxicated in 2000 and ticketed for speeding more than 85 miles per hour in 2010. Express Cab conceded Leal was negligent and Baumrucker was injured but contested the extent of her injuries and the allegations that they acted willfully and wantonly by entrusting the cab to Leal.

¶ 3        After trial, a jury returned a verdict for Baumrucker and awarded her $897,740.81, which included $397,740.81 in compensatory damages and $500,000 in punitive damages. The trial court denied defendants' motion for a judgment notwithstanding the verdict (*n.o.v.*) and motion for a new trial on damages. Defendants contend (i) the evidence did not support the jury's verdict on the willful and wanton entrustment claim, (ii) Leal's driving record should not have been admitted into evidence, (iii) the trial court abused its discretion in permitting Baumrucker to present expert witness testimony that Express Cab had a nondelegable duty to run a background check on prospective drivers, (iv) the trial court abused its discretion in instructing the jury on punitive damages, and (v) the compensatory and punitive damages awards were excessive.

¶ 4        We affirm. The jury's verdict was not against the manifest weight of the evidence, the trial court's evidentiary rulings and jury instruction were not an abuse of discretion, and the damages were reasonable and not excessive.

¶ 5                                 BACKGROUND

¶ 6        On October 17, 2011, at about 3 p.m., Margaret Baumrucker was walking to MacNeal Hospital in Berwyn, where she worked as a psychiatric nurse. Baumrucker, who was 60 years old, was crossing the street at the crosswalk with the right of way. Luis Leal, who was driving a cab he leased from Express Cab, stopped to let a passenger out and suddenly accelerated, hitting Baumrucker. She was knocked to the pavement, injuring her left shoulder. Baumrucker was treated in the MacNeal Hospital emergency room and released.

¶ 7        Baumrucker filed a complaint against Leal and Express Cab alleging negligence. She later amended her complaint to add counts against Express Cab for willful and wanton entrustment.

Her amended complaint alleged (i) negligent operation of a motor vehicle; (ii) negligent entrustment of the cab to Leal; (iii) willful, reckless, and wanton entrustment of the cab to Leal; (iv) negligent hiring of Leal; and (v) reckless, willful, and wanton hiring of Leal. The reckless entrustment claims were based on Baumrucker's allegation that Express Cab knew or should have known Leal posed an unreasonable risk of harm to the public because he had a 2000 conviction for driving while intoxicated and several related offenses, including failure to pay fines, perform community service, attend victim impact panels, and register for DUI school, and a 2010 speeding conviction. (Baumrucker sought to introduce additional convictions, but the trial court excluded evidence of Leal's nondriving criminal record.) The trial court denied defendants motion to dismiss Baumrucker's reckless entrustment counts.

¶ 8    The trial court heard pretrial argument on defendants' motion *in limine*, seeking to prevent Baumrucker from presenting Andrew Sievers as an expert witness to testify that (i) Leal was an unqualified and incompetent driver, (ii) Express Cab was negligent in entrusting him with a cab, and (iii) Express Cab was reckless in failing to screen him regarding his driving record and background. Defendants also sought to bar mention of Leal's criminal convictions or arrests and argument that Express Cab was negligent or reckless when it entrusted the cab to Leal.

¶ 9    After a hearing, the trial court dismissed the negligent entrustment claim but allowed Baumrucker to proceed on the willful and wanton entrustment claim. The court also found Sievers could testify as to his opinion about causation and liability, Express Cab's screening process, and Leal's driving record.

¶ 10   The trial court also heard argument on Baumrucker's motion *in limine* seeking to bar production of Leal's chauffer's license. Baumrucker argued defendants violated Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) by failing to timely comply with her multiple requests for the license, which defendants produced just three weeks before trial. She also contested the authenticity of the license, which was a poorly replicated faxed document that did not include Leal's name or the date of issuance. Defendants made an oral motion to bar argument that Leal did not possess a chauffer's license; they asserted Cicero does not permit operation of a cab without a license and they had produced Leal's license. The trial court agreed that defendants' failure to produce the chauffer's license sooner violated Rule 213, but found no prejudice to Baumrucker. The trial court held the license was admissible and Baumrucker could challenge authenticity.

¶ 11   The case was tried before a jury. (Leal was served a summons and Express Cab filed an appearance on his behalf, but Leal did not appear at trial despite Baumrucker's request under Illinois Supreme Court Rule 237 (eff. July 1, 2005) compelling his appearance; he also did not appear for three noticed depositions.) Donald Batryn, Express Cab's fleet manager, called as an adverse witness, testified he was in charge of finding new drivers. Express Cab does not hire drivers but leases cabs for a flat fee. Express Cab does not give prospective drivers a written test or a road test and does not conduct a criminal background check. And while Express Cab provides orientation for new drivers, it does not provide either training or a training or safety manual.

¶ 12   Express Cab hires drivers who have a chauffer's license issued by the town of Cicero. According to Batryn, Leal completed an application to lease a cab and was hired in September 2011. On the application, which was admitted into evidence, Leal left blank the spaces asking for his social security number, and his prior taxicab and work experience. In the space asking

for his prior address, he listed "ABQ, NM." Spaces on the application indicating whether the applicant was interviewed and the application was acceptable were left blank. Batryn or his brother interviewed Leal and accepted the application, but Batryn could not recall which of them did.

¶ 13 Leal had no prior cab driving experience, but according to Batryn, he had a Cicero chauffer's license. Batryn said to his knowledge, the Cicero police department conducts a written test, a road test, and a five-year criminal background check on chauffer license applicants. He acknowledged he had not seen proof of those tests or a copy of a background check.

¶ 14 Leal obtained an Illinois driver's license on April 26, 2011, some five months before Express Cab hired him. Batryn testified that Leal's driving record was the most important document in deciding to hire Leal, and in accordance with the company's practice, he looked at Leal's five-month Illinois driving record. He did not obtain Leal's driving record from New Mexico, where Leal previously lived, or his prior work history but testified he had "done everything required by me."

¶ 15 Batryn acknowledged that Leal had been convicted of driving while intoxicated in New Mexico and related offenses and, in September 2010, of speeding in excess of 85 miles per hour in Arizona. If Batryn had known about the convictions, he probably would not have allowed Leal to drive for the company, but Express Cab is not required to acquire applicants' out of state driving records. After the accident, Express Cab did not change its hiring procedures.

¶ 16 During Batryn's testimony, the trial court admitted into evidence the copy of Leal's purported Cicero chauffer's license. The license was issued in 2011 but did not have a specific date. It did not include Leal's name but had the number "168" on it. It also had a picture of a man, whom Batryn recognized as Leal. Batryn has seen hundreds of chauffer's licenses issued by Cicero, and the exhibit admitted into evidence appeared to be a Cicero chauffer's license.

¶ 17 Baumrucker presented Andrew Sievers as an expert witness to testify about the vetting process for commercial drivers. Before becoming a safety consultant, Sievers worked in the trucking industry, in various safety and risk management positions. When hiring a driver for a cab or other commercial vehicle, Sievers said that, at minimum, an employer should require applicants to complete a form listing their driving record for the previous three years and conduct an interview; a criminal background check; a physical exam, including vision and drug tests; and a road test.

¶ 18 According to Sievers, Express Cab failed to meet this minimum standard. It did not check Leal's employment history, interview him, do a criminal background check, or conduct a physical, drug test, eye test, or road test. Sievers also said Express Cab's failure to provide a safety manual, explaining rules and regulations and company policies and procedures, falls below reasonable standards. As for Leal's application, it was deficient, lacking Leal's social security number, employment history, taxi driving history, criminal background, or driving record. According to Sievers, Express Cab's screening of Leal was "the worst I've ever seen in screening a commercial driver" and "it's real apparent they did not care; because if they cared they would have done at least a little bit of a background check, and they didn't do any." Had there been safety controls in place, Sievers testified Express Cab could have easily determined Leal was unfit to drive a cab.

¶ 19    Over defendants' objection, Sievers said Express Cab's failure to perform a background check was willful and wanton and put the motoring public at increased unnecessary risk. Defense counsel moved to strike, arguing Sievers should not be permitted to give an opinion on an ultimate issue. The trial court overruled the objection but instructed the jurors they would determine whether Express Cab engaged in willful and wanton conduct.

¶ 20    On cross-examination, Sievers testified that the standards he identified were good practice for owners and operators of commercial vehicles and admitted they were not based on any federal or state laws or regulations. They were his opinion based on Chicago requirements, which he acknowledged were not the same as the rules that apply in Cicero, Express Cab's base. He acknowledged a Cicero ordinance requires chauffer's license applicants to pass a driving test and that Cicero determined if an applicant had any criminal convictions in the previous five years. But, he said, regardless of the rules in Cicero for obtaining a chauffer's license, Express Cab had a nondelegable duty to confirm prospective drivers are fit and safe.

¶ 21    Baumrucker testified she was 60 years old at the time of the accident and a nurse for 40 years, then working in the psychiatric department at MacNeal Hospital. Leal's cab hit her on the right shoulder and hip and slammed her left shoulder to the concrete, causing pain in the upper part of her back, going down the spine. Immediately after the accident, Dr. Sarah Johnson in the MacNeal Hospital emergency room evaluated Baumrucker and sent her home with a sling for her left arm. Three days later, Baumrucker followed up with her primary care physician, Dr. Suman Gupta, who sent her for an MRI of her shoulder and prescribed a muscle relaxant and physical therapy. The MRI did not show a fracture.

¶ 22    Baumrucker went to physical therapy from November 2011 to April 2013 and again from September 2013 to March 2014. She estimated she had more than 60 physical therapy sessions, and since her last one, she had been exercising at home four times a week. She said the physical therapy helped, but she still had shoulder pain, which became exceedingly uncomfortable by day's end. The pain often woke her in the middle of the night. She took ibuprofen about three times a week.

¶ 23    Dr. Gupta referred Baumrucker to Dr. William Sterba, an orthopedic surgeon. Dr. Sterba injected cortisone in her shoulder, which relieved the pain for a few days. Dr. Sterba told Baumrucker surgery would be a last resort. Baumrucker was reluctant to undergo surgery—she is diabetic, has a blood clot in her leg, and was diagnosed with Parkinson's disease in 2012, and those underlying conditions increase the risk of surgery and can lead to slow healing.

¶ 24    At her attorney's direction, Baumrucker saw another orthopedic surgeon, Dr. Samuel Chmell, in August 2012. Dr. Chmell ordered an MRI, told her she had a torn labrum, and recommended surgery. Baumrucker told Dr. Chmell she would prefer to continue with physical therapy because of the risks associated with surgery.

¶ 25    Dr. Chmell testified that Baumrucker has traumatic derangement syndrome (persistent pain) in the left shoulder and adhesive capsulitis (frozen shoulder). He did not operate because of her underlying health problems, namely, (i) diabetes, which increases the risk of infection, and (ii) frozen shoulder and Parkinson's disease, which make postsurgery rehabilitation more difficult. Should Baumrucker decide on surgery, it will cost about $50,000 with additional costs for two to three months of rehabilitation. If she does not have surgery, she will likely need regular care and treatment for the shoulder for the rest of her life, including periodic physical therapy, doctor visits, and medication.

¶ 26    Dr. Chmell opined that Baumrucker's left shoulder problem is permanent and she will likely suffer shoulder pain for the rest of her life and be unable or restricted from doing certain activities, including reaching overhead with her left shoulder and lifting and carrying things with the left arm. She also will likely have trouble sleeping as she will be awakened by a sharp pain when rolling onto her left side.

¶ 27    On cross-examination, Dr. Chmell said adhesive capsulitis is more likely to occur in someone with diabetes, but it would not have occurred but for the accident. Defense counsel impeached Dr. Chmell with his discovery deposition testimony in which he said "I think her adhesive capsulitis is related to her diabetes." Because of the underlying risks, Dr. Chmell would not operate on Baumrucker unless she demanded it.

¶ 28    Thirteen weeks after the accident, Baumrucker returned to work; however, MacNeal Hospital terminated her three months later. She was earning about $1700 a week. Baumrucker acknowledged that due to Parkinson's disease, she cannot work as a nurse. She said that because of her shoulder, she still has trouble doing certain tasks, like carrying grocery bags, putting dishes away, bathing, yard work, and chores around the house. She continues to do physical therapy and takes over-the-counter pain medication.

¶ 29    After plaintiff rested, defendants moved for a directed verdict on the willful and wanton entrustment counts, which the trial court denied. Defendants presented one witness, Dr. Edward Boone Brackett. Dr. Brackett reviewed Baumrucker's medical records and examined her on August 18, 2014. He said her X-rays showed some mild osteoarthritis but no fracture or dislocation. He said that the X-ray taken four days after the accident showed a bone bruise that should heal in four to six weeks and would not require surgery.

¶ 30    In the jury instructions, the trial judge included Illinois Pattern Jury Instruction, Civil, No. 35.01 (2011) (hereinafter, IPI Civil (2011) No. 35.01), an instruction on willful and wanton conduct and punitive damages. The jury returned a verdict for Baumrucker and awarded her $897,740.81, including $397,740.81 in compensatory damages and $500,000 in punitive damages. The jury specifically found that Express Cab acted willfully and wantonly in entrusting the cab to Leal. The trial court denied defendants' motion for a judgment *n.o.v.* and motion for a new trial on damages.

¶ 31                                          ANALYSIS

¶ 32    Defendants contend the trial court erred in denying their motion for a directed verdict and their motion for a judgment *n.o.v.* because Baumrucker failed to present sufficient evidence to support a finding of willful and wanton entrustment. Specifically, they argue that under long-standing precedent, they were only obligated to make sure Leal had a valid Illinois driver's license and a chauffer's license before leasing him the cab. They argue that the trial court should not have allowed Baumrucker's expert, Andrew Sievers, to testify that in his opinion Express Cab, at minimum, was obligated to perform an additional independent background investigation on Leal. Express Cab also asserts that Leal's prior driving-related convictions—a 2000 DUI and a 2012 speeding ticket—were not sufficient to support a finding of willful and wanton entrustment and asks us to reverse the jury's verdict.

¶ 33    "A directed verdict or a judgment *n.o.v.* is properly entered in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern*

- 6 -

*R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Id.* "[A] judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence." *Id.* "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Id.* at 454. When the trial court has erroneously denied a motion for judgment *n.o.v.*, we will reverse the verdict without remand. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. Although a motion for directed verdict and motion for judgment *n.o.v.* are made at different times, they raise the same questions and are governed by the same rules of law. *Id.* We review *de novo* the trial court's ruling on both motions. *Id.*

¶ 34                            Willful and Wanton Entrustment

¶ 35      The Illinois Supreme Court has defined willful and wanton misconduct as a course of action showing actual intent or reckless disregard for the safety of others. *Klatt v. Commonwealth Edison Co.*, 33 Ill. 2d 481, 488 (1965). Whether particular conduct can be characterized as willful and wanton depends on each case's facts and ordinarily presents a question of fact for the jury to determine. *Stehlik v. Village of Orland Park*, 2012 IL App (1st) 091278, ¶ 34. But the trial court may grant a motion for directed verdict where all of the evidence, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d at 510.

¶ 36      Express Cab concedes that liability may arise from entrusting a vehicle to someone whose incompetency, inexperience, or recklessness is known or should have been known by the owner or entrustor of the vehicle. *Lockett v. Bi-State Transit Authority*, 94 Ill. 2d 66, 74 (1983); *Giers v. Anten*, 68 Ill. App. 3d 535, 538 (1978). But Express Cab contends Illinois courts have held that a cab company cannot be deemed reckless so long as the company determined that a prospective driver had a valid Illinois driver's license and a chauffer's license before entrusting the driver with a cab.

¶ 37      For support, Express Cab relies on two cases, *Richards v. Checker Taxi Co.*, 168 Ill. App. 3d 154 (1988), and *Ledesma v. Cannonball, Inc.*, 182 Ill. App. 3d 718 (1989). In *Richards*, the plaintiff, who was injured while a passenger in a Checker taxi, obtained a jury verdict against Checker for negligence and willful and wanton entrustment. Richards argued that Checker's failure to review an abstract of its employee's driving record from the Illinois Secretary of State's office sufficed to support the jury's verdict of willful and wanton entrustment. *Richards*, 168 Ill. App. 3d at 156. The appellate court disagreed, finding no authority required Checker to obtain a copy of the driver's record before entrusting him with a cab and noting that the only requirements, taking into account certain statutory obligations, were that the driver, because he was a taxi driver, have a valid chauffeur's license and, because the vehicle was leased to the driver, a valid driver's license. *Id.* at 157. The evidence showed that the driver met both requirements. But, the court stated that in addition to requiring proper licensing, Checker had a practice of contacting a prospective taxicab driver's previous employer to obtain information on his or her driving record and employment performance. *Id.* The court also

pointed to evidence showing that in the two years the driver worked for Checker before the accident, he had no major traffic violations. *Id.* The court concluded "[b]ased on the record before us, we find no evidence to demonstrate that Checker's conduct was wilful and wanton in entrusting [the driver] with a taxicab. *Id.*

¶ 38 In *Ledesma*, a bicyclist who was struck by a messenger driver sued the driver's employer, Cannonball, Inc., alleging in part that the company willfully and wantonly entrusted a vehicle to the driver. The evidence showed that the driver filled out a job application stating that he had a valid Illinois driver's license and insurance for his vehicle. *Ledesma*, 182 Ill. App. 3d at 721-22. The driver acknowledged his license had previously been revoked and in response to another question concerning whether he had had any traffic violations in the past year, the driver wrote " 'Yes *** License revoked for accident. Traffic ticket for speeding.' " *Id.* at 722. After completing the application, the driver was interviewed by a personnel assistant, who stated in her deposition that the driver's prior license revocation was not determinative in the decision to hire, and that Cannonball considered other factors, including knowledge of the Chicago area, communication skills, physical appearance, and driving record. *Id.* She also said at that time when the applicant had a valid driver's license, the company had no policy to investigate a potential employee's prior driving record beyond the information in the application. *Id.*

¶ 39 Cannonball filed a motion for summary judgment on the willful and wanton entrustment count, which the trial court granted, and the appellate court affirmed. The appellate court found "there was no authority to require Checker to obtain a copy of the driver's record before entrusting the vehicle to him, and noted that the only requirements, taking into account certain statutory obligations, were that the driver, because he was a taxi driver, have a valid chauffeur's license and, because the vehicle was leased to the driver, that he have a valid driver's license." *Id.* at 729 (citing *Richards*, 168 Ill. App. 3d at 157). The court also stated "[s]imilarly, the plaintiff here presents no authority which would suggest that Cannonball was required to investigate [the driver's] past driving record. Like the evidence presented in *Richards*, the evidence here showed that Cannonball checked to make sure that [the driver] had a valid Illinois driver's license and that he was insured before hiring him and entrusting him with the vehicle. Moreover, we note that, similar to the evidence in *Richards*, the evidence here showed that while [the driver] was in Cannonball's employ, he had no major traffic violations." *Id.* at 729-30.

¶ 40 Express Cab argues that *Richards* and *Ledesma* recognize that a prior driving record is irrelevant so long as the prospective driver has a valid driver's license and a chauffer's license. Defendants assert that because the parties do not dispute Leal had a valid Illinois driver's license and Express Cab believed Leal had a valid Cicero chauffer's license, Express Cab met that standard and cannot be deemed to have acted willfully and wantonly in entrusting Leal with a cab. Express Cab also asserts that Leal's possession of an Illinois driver's license necessarily means that the Illinois Secretary of State determined that, regardless of violations in other states, his driving record was good enough to warrant driving privileges in Illinois. And that Cicero, by ordinance, required that applicants for a chauffer's license complete a written test and a driving test, not be addicted to alcohol or drugs, and not have a disqualifying criminal record. Defendants assert that Baumrucker did not present evidence showing Leal failed to meet the requirements of the Cicero ordinance.

¶ 41    Express Cab maintains that rather than follow the standard set forth in *Richards* and *Ledesma*, the trial court permitted Sievers to present a different "minimum" standard to the jury requiring a cab company to perform an independent investigation before entrusting a vehicle to a prospective driver. And this standard was based solely on Sievers's opinion rather than a community standard and or existing law. We disagree.

¶ 42    First, as to Sievers, Express Cab does not provide a persuasive argument for excluding his testimony. He testified based on his knowledge of industry standards, that commercial transportation companies, including those who lease cabs, have an independent duty to vet commercial drivers. Express Cab had the opportunity to cross-examine Sievers on that opinion. Further, Express Cab could have presented its own expert to rebut Sievers but did not do so.

¶ 43    Turning to *Richards* and *Ledesma*, neither case sets forth a bright line rule that a driver's license and chauffer's license alone are sufficient to insulate a cab company from liability for willful and wanton entrustment. In *Richards*, the court concluded that the absence of a driver's abstract from the Illinois Secretary of State did not render the employer's vetting process deficient. But, the court looked at factors in addition to the employee's possession of a driver's license and a chauffer's license in determining that the plaintiff had no claim for willful and wanton entrustment. In addition to requiring the proper licenses, Checker maintained a practice of contacting prospective taxicab driver's previous employer to obtain information on his or her driving record and employment performance with that company. The court also noted that the driver "had been leasing a taxicab from Checker for over two years" and "incurred no major driving violations" and that based "on the record before us, we find no evidence to demonstrate that Checker's conduct was wilful and wanton in entrusting [the driver] with a taxicab." *Richards*, 168 Ill. App. 3d at 157.

¶ 44    Similarly, in *Ledesma*, the court looked beyond licensing in determining whether Cannonball was willful and wanton in vetting a prospective driver before entrusting him with a vehicle. The court noted that the driver completed a job application, which included questions about his driving record, whether his license had ever been revoked or suspended, and whether he had any driving violations in the past year. *Ledesma*, 182 Ill. App. 3d at 721-22. Cannonball also interviewed the driver and explained the factors that influence hiring decision, including knowledge of the Chicago area, communication skills, physical appearance, and driving record. *Id.* at 722.

¶ 45    As noted, whether particular conduct can be characterized as willful and wanton depends on the facts of the case. *Stehlik v. Village of Orland Park*, 2012 IL App (1st) 091278, ¶ 34. As the *Richards* court stated, "the determination of whether an individual would be a competent and safe taxicab driver is subjective rather than objective." *Richards*, 168 Ill. App. 3d at 157. Although proper licensing is required, it is not the lone factor when deciding whether a cab company was willful and wanton in entrusting a driver with a cab. And, we cannot say that when viewed in the light most favorable to Baumrucker, even absent the testimony of Sievers, the evidence so overwhelmingly favors Express Cab that the jury's verdict should be reversed. First, Express Cab required prospective drivers to complete an application, but Leal's was incomplete and devoid of crucial information, including his Illinois driver's license number, social security number, and past job experience. Indeed, the application also has a space for marking whether the application was acceptable or not, and that space was blank. Thus, unlike

*Richards* and *Ledesma*, where the defendants had certain practices and procedures when hiring a driver and adhered to them, Express Cab failed to follow its own vetting standards.

¶ 46    Batryn testified that a driver's driving record was the most important document in analyzing a driver's fitness, but Express Cab considered only the five month driving record he accrued after getting his Illinois driver's license. Leal's employment application listed his address as "ABQ, NM," which would indicate he had a driving record in New Mexico, but Express Cab did not ask for his driving record from that state. Batryn acknowledged that if he had known about Leal's prior driving record, which included a DUI and a speeding ticket, he probably would not have entrusted the cab to him.

¶ 47    Batryn also acknowledged that Leal had never driven a cab before, but Express Cab did not provide him training, a safety manual, or company policies and procedures. Unlike the drivers in *Richards* and *Ledesma*, Leal did not have experience that would lead Express Cab to believe he could be entrusted with a cab.

¶ 48    Even if we agreed that Express Cab only was required to determine whether Leal had a valid driver's license and chauffer's license, the validity of the chauffer's license was a question of fact and based on the evidence it would be reasonable for the jury to determine that Leal did not possess a valid chauffer's license. The trial court stated that Baumrucker could challenge the validity of the license, and considering the facts in the light most favorable to her, the jury could have concluded that Leal did not have a valid chauffer's license.

¶ 49    As noted, Express Cab violated Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007) by failing to produce a copy of Leal's purported chauffer's license, despite Baumrucker's repeated requests. Defendants turned over a purported license a mere three weeks before trial. The trial court permitted Baumrucker to challenge the license's authenticity, and her attorney pointed out that the license, which was a photocopy of poor quality, did not have Leal's name or other identifying information or a date of issue. The license was not self-authenticating because it did not have Cicero's seal or a certification under seal that the town president and clerk who signed the license had official capacity to sign and that their signatures were genuine. See Ill. R. Evid. 902(2) (eff. Jan. 1, 2011). Moreover, defendants did not present any witness to authenticate the license. See Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011) ("Testimony that a matter is what it is claimed to be" satisfies the authentication requirement.). For instance, an official from Cicero did not testify as to its authenticity, and Leal, himself, was not present to testify as to how he obtained the license. Batryn could only testify that the purported license looked like other Cicero chauffer's licenses and the photo looked like Leal. But, based on the poor quality of the document and the lack of testimony authenticating, the jury could have reasonably concluded Leal did not have a chauffer's license.

¶ 50    Defendants also assert that Leal's driving record, which included a 15-year-old DUI conviction and a speeding ticket were insufficient to support a willful and wanton entrustment verdict. But, as noted, in making that assessment the jury was permitted to consider all of the facts presented. The jury did not view Leal's driving record in isolation; they considered other factors, including his inexperience driving a cab and lack of training, both of which were known by Express Cab when they entrusted him with a cab. Viewing the evidence in the light most favorable to Baumrucker, we cannot say that the evidence so overwhelmingly favors defendants that the verdict cannot stand. Thus, the trial court properly denied the motions for a directed verdict and a judgment *n.o.v.*

¶ 51                                    Evidentiary Errors

¶ 52       Next, defendants assert that the trial court made numerous evidentiary errors that deprived them of a fair trial—(i) admission of Sievers's expert's testimony and (ii) Leal's 2001 DUI conviction and 2010 speeding ticket. The admission of evidence is within the sound discretion of the trial court, and we will not reverse the trial court's ruling unless that discretion was abused. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993).

¶ 53       Defendants contend the trial court erred in permitting Sievers to testify as to his opinion on the "minimum" standard for vetting a commercial driver because it was his personal opinion, based on conjecture and speculation, rather than a community standard. Preliminarily, we address Baumrucker's argument that defendants waived their right to raise this issue by failing to object to Sievers's testimony at trial. Baumrucker acknowledges that defendants objected to the testimony in a pretrial motion *in limine* and asserts that to preserve the issue for appeal, they also needed to object when the testimony was offered.

¶ 54       A court's evidentiary rulings are not reviewable on appeal unless properly preserved. *Thornton v. Garcini*, 237 Ill. 2d 100, 106 (2009). When the court makes its rulings before trial in response to the parties' motions *in limine*, the rulings are interlocutory and remain subject to reconsideration throughout trial. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 40 (2010). So denial of the complaining party's pretrial motion to exclude evidence is not sufficient to preserve the issue for appeal. *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002); *Cetera*, 404 Ill. App. 3d at 40. The complaining party also must make a contemporaneous objection at trial when the evidence is introduced to allow the trial court the opportunity to revisit its earlier ruling. *Simmons*, 198 Ill. 2d at 569. Failure to object at trial results in forfeiture of the issue on appeal. *Id.* Express Cab acknowledges it did not make a continuing objection to Sievers's testimony but asserts that we should review it as plain error.

¶ 55       A reviewing court may consider a forfeiture under the plain-error doctrine in civil cases. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 855-56 (2010) (citing *Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 66 (1999)). Although the plain-error doctrine finds much greater application in criminal cases, in limited circumstances it may be applied in civil cases. *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶ 37; *Wilbourn*, 398 Ill. App. 3d at 856 (citing *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 375 (1990)). The cases that have applied it have restricted the plain-error doctrine to situations where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process. *Arient*, 2015 IL App (1st) 133969, ¶ 37; *Wilbourn*, 398 Ill. App. 3d at 856; *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 8 (2007); *In re Marriage of Saheb*, 377 Ill. App. 3d 615, 627 (2007). This court has observed that applying the plain-error doctrine to civil cases should be "exceedingly rare." *Arient*, 2015 IL App (1st) 133969, ¶ 37 (citing *Wilbourn*, 398 Ill. App. 3d at 856, citing *Palanti*, 303 Ill. App. 3d at 66). The question, then, is whether the case before us is the "exceedingly rare" civil case that requires applying the plain-error doctrine. *Id.*

¶ 56       Defendants complain that Sievers was improperly "permitted to make up his own legal standard" that a taxi company has a nondelegable duty to perform an independent investigation and road test on prospective drivers, which is contrary to existing case law as stated in *Richards* and *Ledesma*. This testimony, they argue, prevented defendants from receiving a fair trial and, if allowed, will deteriorate the judicial process. We disagree.

¶ 57 Generally, a person will be allowed to testify as an expert when his or her experience and qualifications provide knowledge that is not common to laypersons and when the testimony will aid the trier of fact in reaching its conclusions. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). An expert only needs to have knowledge and experience beyond that of an average citizen. *Id.* at 429. Sievers's opinion was based on 25 years in the commercial transportation industry, 12 years' experience as a trucking safety consultant, personal experience hiring commercial drivers, and the requirements imposed by the city of Chicago. Further, as noted, we do not agree with defendants that *Richards* and *Ledesma* set forth a bright line rule on proper vetting of cab drivers. Sievers's experience enabled him to provide the jury with his opinion about proper vetting procedures, and defendants were not deprived of a fair trial. As noted, Express Cab could have presented its own expert to refute Sievers's testimony regarding the proper standard of care. There is no reason to review Sievers's testimony for plain error.

¶ 58 Express Cab objected when Sievers offered his opinion on the ultimate issue as to whether Express Cab acted willfully and wantonly by entrusting the cab to Leal. Thus, we will consider that question. An expert witness may generally express an opinion as to the ultimate issue. *Townsend v. Fassbinder*, 372 Ill. App. 3d 890, 905 (2007). The test for whether to admit an expert's opinion on the ultimate issue is whether that opinion aids the trier of fact to understand the evidence or determine a fact in issue. *Id.* Sievers's testimony meets the standard.

¶ 59 In addition, Express Cab contends the trial court erred in admitting Leal's driving record into evidence. Specifically, the trial court should have barred Leal's 2000 DUI conviction under Illinois Rule of Evidence 609(b) (eff. Jan. 1, 2011), which states that evidence of a conviction is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date. Express Cab further asserts that even if Rule 609(b) does not apply, the trial court should have barred admitting into evidence Leal's DUI conviction because its probative value was outweighed by its danger of unfair prejudice, given that the accident was unrelated to the use of alcohol or drugs. Express Cab acknowledges that Leal's speeding ticket is more recent but again asserts that it is unfairly prejudicial as the accident occurred at a slow rate of speed.

¶ 60 Initially, we must point out that Rule 609 does not apply to the facts before us; it expressly applies to evidence of convictions admitted for the "purpose of attacking the credibility of a witness." Ill. R. Evid. 609(a) (eff. Jan. 1, 2011). Leal was not a witness and did not even appear at trial, so the evidence was not admitted for that purpose. Further, in a reckless entrustment of a vehicle cause of action, a driver's driving record "carrie[s] the potential of prejudicing the jury against defendant" but is "highly relevant, if not essential, to plaintiff's case, and to preclude its use was, in practical effect, to abolish plaintiff's cause of action for wilful and wanton misconduct." *Lockett*, 94 Ill. 2d at 74. Because Leal's driving record was relevant to the willful and wanton entrustment claim and not barred by Illinois Rule of Evidence 609(b), the trial court acted properly in admitting it into evidence.

¶ 61                                    Jury Instruction on Punitive Damages

¶ 62 Next, Express Cab argues that the trial court abused its discretion by giving IPI Civil (2011) No. 35.01, because Baumrucker failed to present evidence to support a jury verdict that Express Cab acted willfully and wantonly. Baumrucker contends that defendants waived this

issue by failing to raise it in the trial court. But, defendants did raise it in the posttrial motion for a judgment *n.o.v.* or a new trial.

¶ 63    In general, a trial court has discretion to determine the appropriate jury instructions, and its determination will be reversed for an abuse of discretion. *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998). But a litigant waives the right to object on appeal to instructions or verdict forms that were given to a jury, when the party fails to make a specific objection during the jury instruction conference or when the form is read to the jury. *Marek v. Stepkowski*, 241 Ill. App. 3d 862, 870 (1992). Additionally, even if the litigant properly objects to an instruction or verdict form, the litigant is still required to submit a remedial instruction or verdict form to the trial court. See *id.* Timely objection and submission assists the trial court in correcting the problem and prohibits the challenging party from gaining an advantage by obtaining reversal based on the party's own failure to act. *Morus v. Kapusta*, 339 Ill. App. 3d 483, 489 (2003). The record does not indicate that defendants made a specific objection during the jury instruction conference or tendered a remedial instruction. And, because we find that Baumrucker did present sufficient evidence to establish reckless entrustment, we reject defendants' argument that the trial court abused its discretion in giving the jury the punitive damages instruction.

¶ 64                                                              Damages
¶ 65    Finally, Express Cab argues that the compensatory and punitive damages were excessive and the trial court should have granted its motion for a new trial.

¶ 66    On a motion for a new trial, a trial court will weigh the evidence and set aside the jury's verdict and order a new trial if the verdict is against the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence." (Internal quotation marks omitted.) *Id.* A trial court's denial of a motion for a new trial will not be reversed absent a clear abuse of discretion. *Id.* at 455. The abuse-of-discretion standard applies because the trial judge had the benefit of previous observation of the appearance of the witnesses, their manner in testifying, and the circumstances aiding in the determination of credibility. *Id.* at 456.

¶ 67    The amount of a verdict is generally at the discretion of the jury. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770, 781 (1998). A question of damages is to be determined by the trier of fact, and "a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997); *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 67. But a court will order a remittitur or, if the plaintiff does not consent, a new trial, if a verdict is excessive. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412-13 (1997). In *Richardson*, the supreme court indicated that an award may be viewed as excessive should it (i) exceed the range of fair and reasonable compensation, (ii) be the result of passion or prejudice, or (iii) be so large that it shocks the judicial conscience. *Richardson*, 175 Ill. 2d at 113. Remittitur will not be ordered when an award " 'falls within the flexible range of conclusions which can reasonably be supported by the facts.' " *Best*, 179 Ill. 2d at 412 (quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992)). The opinion also states that when reviewing an award of compensatory damages for nonfatal injuries, a court may consider, among other things, "the permanency of the plaintiff's condition, the

- 13 -

possibility of future deterioration, the extent of the plaintiff's medical expenses, and the restrictions imposed on the plaintiff by the injuries." *Richardson*, 175 Ill. 2d at 114.

¶ 68     Defendants contends that the jury's award of $50,000 in compensatory damages for future surgery was excessive because Baumrucker testified she did not want surgery and her physician, Dr. Chmell, said he would not perform it unless she demanded it and that her adhesive frozen shoulder was related to diabetes and not the accident.

¶ 69     Taking defendants' last contention first, Dr. Chmell did not testify that Baumrucker's frozen shoulder was due to her diabetes. Instead, he testified that "the diabetes makes it more risky and more common for it to happen. I don't think the adhesive capsulitis would have occurred but for the accident though."

¶ 70     Similarly, defendants mischaracterize the jury's award of $50,000 for future medical expenses as money for surgery she will never have. True, Baumrucker agrees with defendants and her own doctor that her diabetes and Parkinson's disease do not make her an ideal candidate for surgery. But Dr. Chmell testified that the shoulder condition was permanent and that Baumrucker, who was 63 years old at trial, would require physical therapy off-and-on for the rest of her life if she did not undergo corrective surgery. Baumrucker asked for $87,000 to cover physical therapy and all other future medical expenses. The jury awarded her $50,000. That is not unreasonable.

¶ 71     As for the remainder of Baumrucker's compensatory damages, defendants do not object to the award of $25,640.81 for medical expenses and $22,100 in lost wages. Baumrucker also requested $250,000 for pain and suffering and $250,000 for loss of normal life. The jury awarded her $150,000 for each. Those amounts are not unreasonable given the permanency of her injury, which will cause pain for the rest of her life and restrict her ability to do basic activities like carrying grocery bags, putting dishes away, bathing, yard work, and other household chores.

¶ 72     Defendants next assert the punitive damages were excessive and warrant a new hearing under the Illinois common law standard or the federal due process standard.

¶ 73     As for the Illinois common law standard, once the court has determined as a matter of law that punitive damages can be awarded for a particular cause of action, the jury must decide based on the evidence whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages. *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116 (1998). The measure of punitive damages to be awarded also presents a question for the jury. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978).

¶ 74     In reviewing a jury's award of punitive damages, relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. *Deal v. Byford*, 127 Ill. 2d 192, 204 (1989). Each case must be assessed in light of the specific facts and circumstances involved, and the underlying purpose of a punitive damage award must be satisfied. *Id.*

¶ 75     "[T]he amount of a punitive damages award will not be reversed unless it is so excessive that it must have been a result of passion, partiality, or corruption." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1139 (2004). Although the purpose of punitive damages is to punish and deter wrongful conduct, juries have been charged with their determination because they depend so closely on the jury's fact finding. *Id.* at 1142. Because a jury's determination of the amount of punitive damages is a predominately factual issue, we

will not reverse a jury's determination as to the amount of punitive damages unless it is against the manifest weight of the evidence. *Cirrincione*, 184 Ill. 2d at 116; *Franz*, 352 Ill. App. 3d at 1145.

¶ 76     Defendants also claim that the jury's award of $500,000 in punitive damages was so excessive that it violated their constitutional right to due process. This analysis differs significantly from the Illinois common law analysis. The due process clause of the fourteenth amendment prohibits grossly excessive or arbitrary punishments on a tortfeasor because they serve no legitimate purpose and constitute an arbitrary deprivation of property. *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 417 (2003). Punitive damage awards generally serve the same purposes of punishment and deterrence as criminal penalties; however, they are not subject to the protections applicable to a criminal proceeding. *Id.* Instead, they are "imprecise[ly]" determined by juries with wide discretion to choose amounts. *Id.* Further, the United States Supreme Court has expressed "concern" that juries may be basing their awards on " 'biases against big businesses, particularly those without strong local presences.' [Citation.]" *Id.*

¶ 77     Accordingly, the United States Supreme Court developed three guideposts to determine whether an award of punitive damages by a jury comports with due process: (i) the degree of reprehensibility of the conduct, (ii) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded, and (iii) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996). We apply *de novo* standard of review to those factors to ensure the punitive damages award is based on the " 'application of law, rather than a decisionmaker's caprice.' " *Cooper Industries Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001) (quoting *Gore*, 517 U.S. at 587 (Breyer, J., concurring, joined by O'Connor and Souter, JJ.)).

¶ 78     The Supreme Court considers the first factor, the degree of reprehensibility of the defendant's conduct, to be the most important. *Gore*, 517 U.S. at 575. In evaluating the reprehensibility of the defendant's conduct, the Court has instructed us to consider whether (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419. The existence of only one of these factors weighing in the plaintiff's favor may not be sufficient to sustain a punitive damage award, and the existence of none of these factors in the plaintiff's favor would render the award suspect. *Id.*

¶ 79     Defendants argue that, under the common law and due process standards, the punitive damages award should be overturned because the only factor favoring Baumrucker is that she sustained a physical injury. They assert that the actual accident was a slow speed collision that occurred because of Leal's inadvertence and that Baumrucker failed to prove that Express Cab acted maliciously or with deliberate indifference to her safety by leasing the cab to Leal because Express Cab did all that was required by the Cicero ordinance.

¶ 80     We disagree and find that the jury's punitive damages award was not excessive or against the manifest weight of the evidence and did not violate defendants' due process rights. Analyzing the due process factors first, we note that no comparable Illinois law imposes a civil penalty, like a fine, for willful and wanton entrustment. Thus, we need not consider this factor.

Next, in examining the reprehensibility of defendants' conduct, the evidence showed that as far as Express Cab knew, Leal only had been licensed to operate a motor vehicle for five months because it did not bother to investigate anything beyond his recently issued Illinois license. As Batryn admitted, had he known of Leal's driving record beyond those five months, he probably would not have hired him. Instead, Express Cab remained willfully ignorant and put a cab driver on the road with little investigation into whether he could endanger the public. Further, according to Batryn, Express Cab knew Leal had never driven a cab but failed to ensure that he was properly trained to reduce the likelihood that he would harm pedestrians and other drivers. And Express Cab did not change their vetting procedures after the accident to ensure that potentially dangerous, untested, and untrained drivers would not be driving their cabs.

¶ 81       As for the disparity between the actual harm and the punitive damages award, defendants argue the $500,000 punitive damages award should be reversed because it bears no relationship to the actual damages suffered—$25,640.81 in medical expenses. First, we note that under the Illinois common law analysis, the amount of punitive damages imposed on a defendant does not have to bear any particular proportion to the size of the plaintiff's compensatory recovery. *Deal*, 127 Ill. 2d at 204. Further, the jury awarded Baumrucker a total of $397,740.81 in compensatory damages, which included the $25,640.81 in medical expenses. Thus, the punitive damages were about 26% greater than the compensatory damages and not as defendants contend, 20 times greater than the compensatory damages award. And the evidence does not show the punitive damages award was so excessive that it must have been a result of passion, partiality, or corruption. Thus, we will not reverse and remand for a new damages hearing.

¶ 82       Affirmed.